**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| **Chris Herring Photography LLC**; and **Chris Herring**, <br><br> Plaintiffs, <br><br> v. <br><br> **Mark R. Herring**, in his capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his capacity as Director of the Virginia Division of Human Rights and Fair Housing, <br><br> Defendants. | Case No. _____ <br><br> **Verified Complaint** |

### Introduction

Plaintiff Chris Herring is a photographer with a passion to show others the beauty in God's creation. At first, this passion took Chris around the world, capturing sunsets, rain forests, and other jaw-dropping landscapes. Then, after photographing a friend's wedding, Chris realized he could capture the beauty God created in marriage. In all his photography, Chris' passion shapes how and what he creates. And like most other artists, Chris creates photographs for anyone no matter who they are; he just cannot create some content for anyone no matter who they are—whether that be content promoting pollution, pornography, or certain views about marriage. It's this last editorial judgment, though, that Virginia finds objectionable—threatening to fine Chris into bankruptcy for not creating photographs and blog posts he objects to.

Virginia did this recently through its Virginia Values Act, which forbids businesses from discriminating on the basis of sexual orientation. Va. Code § 2.2-3904(B). But Virginia interprets this law to force Chris to do more than serve LGBT clients (which Chris already does). Virginia instead requires Chris to promote *content* he disagrees with—to create and convey photographs and blogs celebrating same-sex weddings because he does so for weddings between a man and a woman. The law even makes it illegal for Chris to hold a policy of photographing and blogging

about weddings only between a man and woman or to post internet statements explaining his religious reasons for only creating this wedding content. Va. Code §§ 2.2-3904(B), -3906(A) (forbidding "attempt[s] to refuse" services, "publish[ing] … communication[s]" declining service, and engaging in "pattern and practice" of declining services considered discriminatory).

If Chris does any of this, the law subjects him to investigations, onerous administrative processes, multiple lawsuits, fines up to $50,000 initially and then $100,000 per additional violation, plus unlimited damages and attorney-fee awards, and court orders forcing him to create photographs and blogs against his conscience. Va. Code §§ 2.2-3906, -3907, -3908. These penalties could easily exceed a million dollars, ruin Chris financially, and make operating his business impossible.

So Chris faces an impossible choice: violate the law and risk bankruptcy, promote views against his faith, or close down. And this was exactly what Virginia officials wanted for those who hold Chris' religious beliefs about marriage. Legislators who passed Virginia's law called views like Chris' "bigotry" and sought to punish them with "unlimited punitive damages" to remove them from the public square.

But the First Amendment puts a hitch in these plans. Just as Virginia cannot force atheist newspaper editors to print op-eds promoting Christianity or LGBT artists to design church-flyers condemning same-sex marriage, Virginia cannot force Chris to convey messages he objects to. The First Amendment ensures each of us can choose what we say and what we celebrate, even when the government dislikes it. Chris filed this lawsuit to restore his First Amendment right to do exactly this and to protect this freedom for everyone—because a government that can censor Chris' view on marriage today can just as easily censor other views tomorrow.

**Jurisdiction and Venue**

1.      This civil-rights action raises federal questions under the First and Fourteenth

Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested declaratory relief under 28 U.S.C.

§§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28

U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and the requested costs and attorneys'

fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the

events and omissions giving rise to the claims occur within the Eastern District of Virginia's

Norfolk Division, the effects of the challenged statute are felt in this Division, and Defendants do

and can perform official duties in this Division.

**Plaintiffs**

5.      Chris Herring is a United States Citizen and resides in Norfolk, Virginia.

6.      Chris is the sole member-owner of Chris Herring Photography LLC.

7.      Chris Herring Photography LLC is a for-profit limited liability company organized under

Virginia law.

8.      Chris Herring Photography LLC's principal places of business are in Norfolk, Virginia

and Chesapeake, Virginia.

**Defendants**

9.      Virginia Attorney General Mark Herring is the chief executive officer of the Virginia

Department of Law, which includes the Division of Human Rights ("Division"). *See, e.g.*, Va.

Code §§ 2.2-500, -520.

10.     Attorney General Herring administers and enforces Virginia law, works with law enforcement, assists with local prosecutions when requested by local Commonwealth attorneys, and defends Virginia's government throughout the state. *See* https://www.oag.state.va.us/our-office/about-the-office.

11.     Attorney General Herring also supervises attorneys stationed in Norfolk. *See* https://www.oag.state.va.us/index.php?option=com_content&view=article&id=400.

12.     Attorney General Herring oversees the Division, designates the Division Director, and administers and enforces the Virginia Human Rights Act ("Virginia's law" or "the law"), the law challenged in this lawsuit. *See, e.g.*, Va. Code §§ 2.2-500, -520(B), -3906, -3907(A), -3908(C); 1 Va. Admin. Code § 45-20-20 (defining "Director").

13.     Attorney General Herring is named as a defendant in his official capacity.

14.     Director R. Thomas Payne, II is the Division Director and administers and enforces the law. *See, e.g.*, Va. Code §§ 2.2-520(B), -3907(A); 1 Va. Admin. Code §§ 45-20-90, -100, -120.

15.     Director Payne is named as a defendant in his official capacity.

16.     Attorney General Herring and Director Payne have the duty and jurisdiction to administer and enforce Virginia's law throughout the state of Virginia, including Norfolk. Va. Code §§ 2.2-520, -3900; 1 Va. Admin. Code § 45-20-10, -20 (defining "Director").

17.     Attorney General Herring may also file suit under Virginia's law in any "appropriate circuit court" and may intervene in any private lawsuit seeking to enforce the law in any general district or circuit court in Virginia. Va. Code §§ 2.2-3906(A), -3908(A), (C).

**Factual Background**

Chris Herring discovers his passion for photography.

18.     Chris is a Christian who was born, raised, and spent most of his life in Virginia.

19.     Chris' faith shapes every aspect of his life, including his identity, relationships, actions, and understanding of creation, truth, morality, beauty, and vocation.

20.     Chris believes that God created the world and everything in it.

21.     When Chris was young, he frequently drew and painted the beauty of the wilderness when his family vacationed in the Great Smoky Mountains and other outdoor locations.

22.     Just before college, Chis bought a camera to help him stay connected with his younger brother who had an interest in photography.

23.      During college, photography gave Chris an expressive outlet and a chance to be creative.

24.     Chris' friends noticed his photography and began asking him to photograph their portraits, school functions, and other subjects.

25.     Meanwhile, Chris continued to spend time outside through hiking and other activities and brought his camera with him to capture images of nature.

26.     Chris also traveled to several countries where he photographed landscapes and nature.

27.     Chris discovered that observing nature and human interactions led him to see and understand both God and His design for the world in new ways.

28.     In early 2014, Chris began posting his photographs on a personal Instagram account so that he could share his images and comments to a broader audience.

29.     Eventually, Chris decided to start his own photography business to engage his passion for photography, entrepreneurialism, and celebrating God's creation.

30.     Specifically, Chris wanted to create photographs that glorified God by illustrating His beauty, majesty, grandeur, design for the world, and love for creation.

31.    Chris later took a position with a church as a youth and families director and began

attending a Southern Baptist seminary, where he is now studying for a master's degree in ethics,

theology, and culture.

32.    Chris started seminary in part because he saw our culture starting to reject many

principles he holds, and he wanted to learn how to defend these principles.

33.    Chris also began seminary to gain biblical training to combine his photography skills and

entrepreneurial spirit with his desire to teach others about God and His creation.

34.    Chris hopes that by creating photographs celebrating God's design for the world, others

will recognize the truth about God and the Gospel and how these truths are evident in His

creation.


Chris starts Chris Herring Photography.

35.    Chris started Herring Adventures in May 2017.

36.    Chris operated Herring Adventures as a sole proprietorship.

37.    Chris created a website for Herring Adventures in 2018 and a Facebook account for

Herring Adventures in 2019.

38.    Chris also transitioned his Instagram account into Herring Adventures' account.

39.    Initially, Herring Adventures only offered adventure photography to businesses.

40.    Later, friends asked Chris to photograph their wedding.

41.    After doing this, Chris realized he could continue to celebrate the beauty of God's

creation and point people to God through wedding photography—both by incorporating

landscapes into his wedding photography and by promoting God's design for marriage which

reflects Jesus' sacrificial relationship to his Church.

42.    So Chris decided to expand his business to include wedding photography.

43.     As part of this expansion, Chris rebranded and reorganized to gain the benefits of a corporate form, incorporating his business as a limited liability company in June 2020 and renaming it Chris Herring Photography LLC.

44.     Chris is the sole owner and member and the only person employed by Chris Herring Photography LLC.

45.     Chris transitioned Herring Adventures' website (now www.chrisherringphotography.com) and Facebook account to Chris Herring Photography accounts so that he could promote his services and beliefs and messages about creation, marriage, and other topics to the general public.[1]

Chris Herring Photography celebrates God's creation and design.

46.     Chris Herring Photography is a for-profit photography business that offers and provides photography services to the general public on a commission basis.

47.     Chris Herring Photography offers two kinds of photography services: (1) adventure photography and (2) wedding photography.

48.     Chris solicits and receives inquiries for his adventure and wedding photography from the general public through his business's website and social media accounts, referrals from clients, and referrals from his personal and professional network.

49.     Chris' website also has a contact form where anyone in the world can request Chris' photography services.

50.     Adventure photography involves creating photographs of outdoor adventures and is marked by stunning landscapes, dynamic personalities, and ever-changing shooting conditions.

---

[1] Unless context indicates otherwise, the remainder of the complaint refers to Chris Herring Photography LLC as "Chris Herring Photography" and to all plaintiffs collectively as "Chris."

51.     Chris' adventure photography portrays landscapes, scenery, and individuals in a way that celebrates the beauty of God's creation, truth, the need for God to correct injustice, and the unique qualities that make us human.

52.     Chris provides his adventure photography to companies like travel agencies, hostels, tourism boards, outdoor adventure brands, and coffee companies for them to use in advertisements and other mediums.

53.     Chris' adventure photography involves two parts.

54.     First, Chris photographs images that illustrate the artistry with which God designed the world, often by emphasizing nature's patterns, magnitude, and beauty.

55.     Second, Chris edits these photographs to enhance the image's beauty or to emphasize specific aspects of the image.

56.     Chris also frequently posts his commissioned adventure photographs on his business' blog or social media sites with text emphasizing the beauty of God's creation.

57.     As for Chris' wedding photography, these photographs always portray engaged and married couples, marriages, and weddings in a positive, celebratory way.

58.     Chris' wedding photography involves three parts.

59.     First, Chris photographs an engagement or wedding.

60.     Second, Chris always selects the highest quality photographs he has taken of the engagement or wedding and edits those photographs.

61.     Third, for all weddings since 2020, Chris always chooses some finalized photographs from the engagement or wedding to post onto his business' blog or Facebook account, arranges the photographs to document the engagement or wedding, and writes an encouraging message to the couple and the public about the engagement or wedding alongside the photographs.

62.     Whenever Chris is hired to photograph an engagement, wedding, or both, he always bundles his photography, editing, and blogging into a single package because doing so allows Chris to more fully and accurately celebrate the engagement or marriage photographed and promote his views on marriage to the couple and the public.

63.     Chris would decline a request to provide wedding photography services if the request required him to portray married couples, marriages, or weddings in a negative light or to provide only one part of his services—i.e., a request to only photograph an engagement or wedding, only edit engagement or wedding photographs, or only write a blog post.

64.     Everything Chris creates and provides is created custom for each client.

Chris' faith motivates his photography and photography business.

65.     Chris' faith motivates why and how he operates his photography business.

66.     Chris believes that Christians are called to love others by building relationships with them and by spreading the truth about the Gospel.

67.     Likewise, Chris believes that God gives people gifts and passions and commands them to steward these in a way that glorifies and honors Him, including by celebrating His creation and promoting the Gospel.

68.     Chris also believes that God created, called, and equipped some people, including him, to reflect God's artistry by creating artistic and aesthetically pleasing artwork for their vocations.

69.     Chris also believes he must honor God in how he interacts with others, including current and potential clients and people he meets while creating photography.

70.     Chris also seeks to fulfill the biblical command to love others by being honest with current and prospective clients and the public and by treating them with love, honesty, fairness, and excellence.

71.     To do this, Chris wants to be honest with current and prospective clients and the public by, for example, explaining the types of photographs he will and will not create and by explaining the reasons for his decisions.

72.     Another way Chris seeks to honor and glorify God is by what he creates, promotes, and participates in.

73.     Chris believes that all art—including his—should glorify and honor God by directing people to God's design for creation and the hope God provides for humankind.

74.     For this reason, in everything Chris Herring Photography creates, Chris seeks to glorify God and His design for His creation as defined by Chris' religious beliefs.

75.     Chris believes that God designed marriage as a gift for people of all faiths, races, and backgrounds and that God ordained marriage to be a covenant between one man and one woman that reflects and points people to God's design for creation, to Jesus' special relationship with His Church, and to God's act of beginning a new creation through Jesus' sacrificial death and resurrection. (Genesis 2:18-24; Matthew 19:4-6; 2 Corinthians 5:16-21; Ephesians 5:22-33; Colossians 3:1-17).[2]

76.     Chris' views on marriage come from his personal interpretation of the Bible, the denominational teachings of the Southern Baptist Convention, and other Christian leaders, pastors, and theologians that Chris admires.

77.     Because Chris believes that God has called him to celebrate God's design for creation and for marriage, Chris wishes to celebrate engagements and marriages between one man and one woman in what he photographs, participates in, and posts about.

---

[2] All Bible citations reference the English Standard Version.

78.     Chris believes that by celebrating these engagements and marriages, he can promote God's love, God's design for marriage and creation, God's work to begin forming a new creation, the beauty and intimacy of marriage, and his religious beliefs about marriage to his clients, the wedding audience, and the public.

79.     Chris believes that by capturing and conveying engagements and weddings between a man and woman, he can show the beauty and joy of marriage as God intends it and convince his clients, their friends, and the public that this type of marriage should be pursued and valued.

80.     In fact, Chris' desire to convey this message has only increased over time as he has seen our culture normalize and promote views inconsistent with his religious beliefs about marriage.

81.     Chris hopes to counteract this cultural narrative by promoting marriage as God designed it, according to Chris' religious beliefs.

Chris celebrates God's design for marriage through his photography.

82.     Chris evaluates every wedding photography request his business receives to determine if he can potentially fulfill it.

83.     If Chris determines that he can potentially fulfill that request, he tries to connect with prospective clients by conducting an initial consultation, typically at a coffee shop or some other public place, or if necessary, by videoconference.

84.     Chris does this so that he and the prospective client can get to know each other.

85.     During these consultations, Chris asks about the engaged couple, their relationship, and their desires for their wedding ceremony.

86.     If Chris decides to move forward with offering his wedding photography, he always offers to provide the prospective client both engagement and wedding photographs.

87.     Chris does this because engagement sessions provide a low-pressure environment where Chris learns about the couple, their relationship, and their personalities, which helps prepare and inspire him to express the couple's joy and excitement on their wedding day.

88.     If the prospective client agrees to hire Chris, the client signs a customized version of Chris Herring Photography's form service agreement.

89.     This service agreement specifies Chris' terms and processes for his wedding photography and allows the client to customize the services they want Chris to provide (e.g., photographs for the engagement session and wedding or just the engagement or just the wedding).

90.     Among other things, the agreement specifies that Chris "exercises and reserves the right to exercise complete and ultimate editorial judgment and control over all aspects of his services, including photography, editing, blogging, social media promotion, and all other Services."

91.     If Chris is hired to photograph an engagement session, he is involved with many aspects of the shoot and always attends and participates in the entire session.

92.     For example, he suggests shoot locations and recommends clothing colors and style for the couple to wear to create the most aesthetically appealing image.

93.     On one occasion, Chris helped the groom-to-be plan the proposal, and then Chris hid behind bushes to discretely photograph the surprise proposal.

94.     Chris typically photographs the couple for about two hours.

95.     Chris photographs the engagement session in a way that captures the couple's authentic love for each other, their joy and excitement about their upcoming marriage, and the spontaneity of their affections for each other.

96.     To do this, Chris tries to create a light-hearted mood by talking and laughing with the couple, by asking them questions about their relationship, by encouraging them to be excited about their upcoming wedding and by encouraging them to act naturally.

97.     For example, Chris always tries to photograph unplanned moments of the couple smiling or looking at each other or laughing with each other.

98.     Chris also directs the couples to pose in certain ways to elicit the joy and romance of the couple's engagement and their anticipation of their marriage.

99.     Such poses always include the couple kissing, embracing, and walking hand-in-hand, as well as close-ups of the engagement ring.

100.    Chris would decline a request to photograph an engagement session that did not depict the couple or the couple kissing, embracing, or walking hand-in-hand.

101.    After each engagement session, Chris edits the photographs and delivers between fifty and seventy-five edited photographs to his clients.

102.    Chris also posts a sample of the photographs on his blog and writes an encouraging note about the couple on his blog. *See infra* ¶¶ 132–33, 135–36.

103.    On the wedding day, Chris is personally excited about the marriage he is about to witness because of his religious beliefs about God's design for marriage.

104.    Typically, Chris spends at least six hours photographing a wedding.

105.    Chris arrives early so that he can connect with the couple, encourage them, and celebrate with them.

106.    He also uses this time to photograph the wedding's surroundings and unique details.

107.    Chris typically photographs the guests arriving and attempts to capture their excitement over the joyous ceremony they are about to witness.

108.    Chris also greets many of the guests as they arrive, interacts with them, verbally encourages them to rejoice in the upcoming wedding, and shares in their joy over the upcoming ceremony.

109.    When the wedding ceremony begins, Chris photographs the ceremony itself.

110.    Chris always attends and participates in the entire wedding ceremony and would not provide wedding photography if requested to photograph only a part of the wedding ceremony or everything but the wedding ceremony.

111.    During the ceremony, Chris photographs the wedding's most special moments, which typically include the bride walking down the aisle, the bride's father walking with his daughter, the couple gazing at each other, the officiant delivering the homily, the couple kissing before the attendees, and the officiant announcing the couple as husband and wife.

112.    To capture these moments, Chris often positions himself near the front of the wedding venue where the audience can easily see him.

113.    Chris' wedding photography responsibilities require him to physically attend and actively participate in each wedding ceremony.

114.    Chris cannot practically leave the ceremony at any time or arrive late or avoid physically attending or participating in the ceremony because he cannot photograph any moments of the wedding ceremony that could occur during his absence.

115.    At every wedding Chris has photographed, there have been prayers, a procession, a homily, an exchange of vows, an officiant, and a pronouncement of marriage.

116.    Likewise, the wedding officiant has always given instructions to members of the audience, including Chris.

117.    Whenever Chris photographs a wedding, he feels coercive peer pressure from the officiant, the couple, and other wedding guests to participate in the rhythms of the ceremony.

118.    In every wedding Chris has photographed, the wedding officiant has said a homily and prayed and Chris has said "Amen" after the prayers.

119.    These homilies and prayers have been directed at both the couple getting married as well as members of the audience, including Chris.

120.    Chris also took communion at one wedding.

121.    In these ways, Chris acts as a witness before God and those assembled as the bride and groom commit their lives to each other, exchange rings, are pronounced man and wife, are prayed over, and share their first kiss as a married couple.

122.    After the ceremony, Chris typically photographs portraits of the bride and groom, the wedding party, and the bride and groom with their family and guests.

123.    Especially when photographing the bride and groom together, Chris encourages the couple to act naturally and be themselves so that he can capture their genuine emotions on their wedding day.

124.    Afterwards, Chris photographs the wedding reception's most special moments.

125.    While Chris photographs organic interactions, he also heavily choreographs many of the wedding photographs.

126.    For example, Chris directs members of the wedding party and the bride and groom's family on how to stand, where to position themselves, and what demeanor to display.

127.    Throughout the wedding day, Chris verbally encourages the couple, the wedding party, and the wedding guests to enjoy the wedding day and to celebrate and rejoice about the wedding that is taking place and the marriage that is being started.

128.    Chris could not effectively provide his wedding services if he did not personally interact with, communicate with, and verbally encourage the couple, the wedding party, and the wedding guests in these ways.

129.    After the wedding day, Chris begins to edit the wedding photographs.

130.    During this editing process, Chris reviews each photograph and discards any that do not meet his artistic and moral standards, such as blurry photographs or photographs that show people in embarrassing situations.

131.    Chris also reviews and edits each photograph to ensure that they contribute to an overall story celebrating the couple, their wedding, and God's design for marriage.

132.    Chris follows the same editing process described in paragraphs 130 and 131 to edit engagement photographs.

133.    After the wedding, Chris delivers several hundred edited photographs to his client.

134.    Chris then posts some of the wedding photographs on his blog or Facebook account along with text celebrating the couple and their marriage.

135.    Chris' engagement and wedding blog and Facebook posts are integral to his wedding photography.

136.    Many commissioned photographers post engagement and wedding photographs on their blogs or social media sites and congratulate the couples they photograph.

137.    Chris' posts allow him to publicly celebrate, encourage, and congratulate each couple; to publicly associate himself with his wedding photography; to promote his business, artistic style, personality, and approach to photography; to proclaim his religious beliefs about marriage; to allow the couple to identify with Chris Herring Photography; and to allow each couple to publicize their engagement and wedding to a greater audience than they otherwise could.

138.    These posts also allow Chris to convey the beauty of marriage between a man and a woman in a more powerful way than through photographs or words alone.

139.    Chris' name or picture or Chris Herring Photography's name or logo always appear in or nearby these engagement and wedding posts.

140.    Chris' service agreement also requires his clients to attribute Chris' engagement and wedding photographs to him anytime the clients post, print, or in any way publish these photographs publicly.

141.    In these ways and more, Chris associates himself with his wedding photography.

142.    For Chris' wedding photography (engagements included), Chris' clients rely on his aesthetic vision and ability to celebrate their engagement and wedding in a meaningful way.

143.    For most editorial decisions Chris makes during his wedding photography, Chris does so without any input from clients, including how to take individual photographs, how to edit individual photographs, and what to post on his blog.

144.    For all other editorial decisions, Chris receives some suggestions from clients and collaborates with them.

145.    Typically, Chris' clients defer to his advice and suggestions.

146.    For example, Chris' clients sometimes have a general idea of some photographs they want or poses they want depicted, and they offer suggestions about these things.

147.    Chris then takes these suggestions, offers his own guidance, and blends his clients' suggestions into his own aesthetic vision so that the final work effectively celebrates their engagement or wedding and God's design for marriage.

148.    But even when Chris' clients make suggestions, they still rely heavily on Chris' artistic and editorial judgments about what and how to photograph, how to edit photographs, how to

17

blog, and how to capture the most meaningful moments of the engagement or wedding in a compelling and appealing way.

149.    For all of his wedding photography services, Chris has ultimate editorial judgment and control over the photographs he takes, the photographs he edits, and the content of his blog, and he always retains discretion to reject any client suggestion if he deems it improper.

150.    For all of his wedding photography services, Chris makes numerous artistic and editorial judgments to positively portray and celebrate the couple's engagement or marriage, and to convey the beauty and goodness of engagements and marriages between one man and one woman.

151.    In all of the ways described in paragraphs 142 through 150, Chris exercises editorial judgment and control over the narrative of the engagement or wedding photography to create visual images that positively portray and promote the couple and their marriage, celebrate God's design for marriage, and transform discrete moments into lasting memories.

152.    Each component of Chris' wedding photography services—his photography, his editing, and his blogging—separately and in combination, is expressive in nature, as it involves either text, images, symbols, or other modes of expression.

Chris cannot create photographs or participate in ceremonies contrary to his religious beliefs.

153.    Not only do Chris' religious and artistic beliefs inspire what he photographs, writes about, and participates in, these beliefs also dictate what he cannot create, say, or do.

154.    Chris believes that he cannot rejoice in, condone, participate in, celebrate, or promote anything dishonorable to God. (Isaiah 5:20; Ephesians 5:1-14; 1 Timothy 5:22; 1 Corinthians 10:1-22; 2 Corinthians 6:14-18).

155.    For Chris, this means he can only create photographs and blogs and participate in events and ceremonies consistent with his understanding of the Bible's teachings.

156.    For this reason, Chris can only accept requests for adventure and wedding photography which are consistent with his editorial, artistic, and religious judgment.

157.    It is standard industry practice for commissioned photographers to decline to create content that violates or compromises their beliefs or editorial and artistic judgment.

158.    Chris therefore does not provide adventure and wedding photography that require him to use his photography skills to celebrate anything immoral, dishonorable to God, or contrary to his religious beliefs, or to participate in anything contrary to his religious beliefs.

159.    For example, Chris does not provide photography services that demean others, devalue God's creation, portray His creation negatively, condone racism, sexually objectify someone, celebrate pornography or obscenity, praise vulgarity, or contradict biblical principles.

160.    For example, Chris would not provide adventure photographs for a travel agency promoting a red-light district, a tourism board promoting drug tourism, or for any other business requesting photographs promoting sexually explicit acts or glorifying pollution.

161.    Likewise, because Chris believes that God created marriage to be a joyful, exclusive union between one man and one woman, he cannot provide wedding photography which depicts engaged or married couples, marriages, or weddings in a negative way or promotes or celebrates any engagements, weddings, or marriages not between one man and one woman, such as same-sex, polygamous, or open engagements or marriages.

162.    Chris also believes that all wedding ceremonies are inherently religious events because they solemnize and initiate an institution (marriage) created by God.

163.    Chris therefore cannot provide photography services for same-sex, polygamous, or open-marriage engagements or weddings because photographing and blogging about these events would violate Chris' religious and artistic beliefs, promote activities contrary to his beliefs, express messages contradicting his beliefs, and express messages contradicting messages that Chris wants to and does promote elsewhere.

164.    Chris also cannot photograph such weddings because he always attends and actively participates in the weddings he photographs (*see supra* ¶¶ 113–21) and Chris believes that he cannot participate in any ceremony that contradicts his religious beliefs.

165.    If Chris were compelled to photograph a same-sex, polygamous, or open-marriage wedding, he would feel coerced to obey the instructions of the officiant, to remain silent during the pronouncement of the couple, and to participate in the other rhythms of the ceremony because his non-participation would be easily seen and singled out by the other audience members due to his prominent position at the wedding ceremony.

166.    For these reasons, it is Chris' formal policy, pattern and practice, and standard operating procedure to only offer wedding photography services celebrating weddings between one man and woman and to decline any photography requests celebrating any other weddings—including those for same-sex engagements or weddings—which would violate Chris' religious and artistic beliefs or require him to participate in any ceremony that contradicts his religious beliefs.

167.    Whenever Chris receives a request he cannot fulfill because of a conflict with his beliefs, he tries to refer that request to another photographer who can do so.

168.    Chris' pattern and practice of only offering wedding photography services celebrating weddings between a man and a woman and for declining requests for photography services

celebrating same-sex, polygamous, or open-marriage engagements or weddings are never about the person requesting these services.

169.    Instead, Chris' pattern and practice of not offering to photograph these ceremonies is an objection to promoting and participating in a sacred event that violates his religious beliefs.

170.    For example, Chris will happily work with LGBT photographers to create adventure or wedding photographs.

171.    Chris will also create adventure photographs for businesses that are owned and operated by LGBT persons.

172.    Chris will create adventure photographs for individuals who identify as LGBT and will travel with LGBT individuals to capture these adventure photographs.

173.    Chris will create these adventure photographs described in paragraphs 171 and 172 so long as the photographs themselves do not violate Chris' religious beliefs.

174.    Chris will also create wedding photographs for an engagement of one man and one woman if he were hired by the future bride's gay father or by the future groom's lesbian mother.

175.    Chris will also create wedding photographs for a wedding between a homosexual man and a woman so long as the couple intends the marriage to be a lifelong union between that one man and one woman.

176.    Chris will also create wedding photography for a wedding between a bisexual woman and a man so long as the couple intends the marriage to be a lifelong union between that one man and one woman.

177.    As for paragraphs 175 and 176, several research institutes estimate that between thirteen and eighteen percent of adults who identify as gay or lesbian are married to members of the opposite sex.

178.    On the other hand, Chris would decline requests from heterosexual individuals to create wedding photographs for someone else's same-sex engagement or wedding or for the heterosexual individual's polygamous or open-marriage engagement or wedding.

179.    And because it is Chris' pattern and practice to decline requests to create photographs which violate his religious beliefs, Chris does not accept every request to photograph an engagement or wedding between one man and one woman.

180.    For example, Chris does not create wedding photographs for certain themed engagements and weddings between a man and a woman, such as weddings with marijuana, Vampire, or superhero themes.

181.    Chris does not create these engagement or wedding photographs because they are inconsistent with his religious beliefs that weddings are a joyful and solemn occasion which should be revered as initiating an institution created by God.

182.    When evaluating whether any request for his adventure or wedding photography is consistent with his religious beliefs, Chris considers, and it is his pattern and practice to consider, the message conveyed by the requested services and whether these services require him to create a message he opposes or participate in a ceremony he objects to, not the identity of who requests these services.

Virginia's law threatens Chris' wedding photography and business.

183.    Chris desires to operate his business consistent with his religious beliefs and to expand his business to provide services for more engagements and weddings.

184.    Chris began researching how he could do this and discussing his business with others.

185.    During this process, a co-worker's husband called him and told him about a pending law in Virginia that could affect his wedding photography business.

186.    Chris then spoke with an attorney and learned about the Virginia Values Act which would substantially revise the Virginia Human Rights Act, Va. Code § 2.2-3904 *et seq.*

187.    Chris realized that these revisions greatly affected his business and threatened devastating penalties if he continued to photograph engagements and weddings only between one man and one woman.

188.    Chris also saw news reports about other creative professionals in the wedding industry across the country who faced lawsuits and severe penalties for declining to celebrate same-sex wedding ceremonies.

189.    The Virginia Values Act amends Virginia Human Rights Act, effective July 1, 2020.

190.    Among other things, Virginia's new law prohibits "unlawful discrimination because of" sexual orientation in "places of public accommodation." Va. Code § 2.2-3900(B)(1)-(2).

191.    The law defines a "place of public accommodation" as "all places or businesses offering or holding out to the general public goods, services, privileges, [or] advantages …." Va. Code § 2.2-3904(A).

192.    Chris Herring Photography is a for-profit business offering goods, services, privileges, and advantages to the general public through adventure and wedding photography.

193.    Chris Herring Photography also advertises its goods, services, privileges, and advantages to the general public on its website and blog and social media sites and through word-of-mouth.

194.    Chris Herring Photography is therefore a place of public accommodation under and subject to Virginia's law.

195.    The law prohibits "unlawful discrimination" in public accommodations (§ 2.2-3904(B))

through two clauses: the "Accommodations Clause" and the "Publication Clause."[3]

196.    The Accommodations Clause (§ 2.2-3904(B)) makes it unlawful "for any person … to

refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny

any individual, directly or indirectly, … or to segregate or discriminate against any [] person in

the use [of]" any "advantages, … services, or privileges made available in any place of public

accommodation … on the basis of … sexual orientation."

197.    The Accommodations Clause prohibits Chris from:

- exclusively offering wedding photography services that promote and celebrate engagements and weddings between one man and one woman;

- declining requests for wedding photography services that promote and celebrate same-sex engagements and weddings if he offers these services when they promote and celebrate opposite-sex engagements and weddings;

- maintaining a written editorial policy or unwritten editorial practice of offering or providing wedding photography services only for engagements and weddings celebrating marriage between one man and one woman;

- maintaining a written editorial policy or unwritten editorial practice of uniformly declining requests to create photography services celebrating same-sex engagements and weddings while accepting requests for photography services celebrating opposite-sex engagements and weddings; and

---

[3] For ease of reference, the complaint categorizes the law's prohibitions by naming them the
Accommodations Clause and the Publication Clause.

- providing any unequal treatment when providing wedding photography services celebrating same-sex engagements and weddings compared to requests celebrating opposite-sex engagements and weddings.

198.    As to the last point, the Accommodations Clause makes it unlawful for Chris to treat wedding-photography requests for same-sex weddings different from wedding-photography requests for opposite-sex weddings—whether by responding to the former more slowly or by offering any part of his services to the former but not the latter.

199.    For example, because Chris always offers to photograph a couple's engagement and wedding and posts about it, Chris could not offer to photograph a same-sex couple's engagement but decline to photograph their wedding or not post about it.

200.    The Accommodations Clause also forces Chris to provide photography services for same-sex engagements or weddings and would require Chris to promote messages that violate his religious beliefs or require him to participate in religious ceremonies that violate his religious beliefs, something he cannot do. *See supra* ¶ 154.

201.    This undercuts Chris' message (expressed elsewhere in his photographs, blog, and Facebook account) celebrating marriage between one man and one woman; harms Chris' reputation among his past and prospective clients; and adversely affects Chris' ability to share biblical truths about marriage with others.

202.    The Publication Clause (§ 2.2-3904(B)) makes it unlawful for any person "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, … privileges, or services of any such place [of public accommodation] shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation."

203.    The Publication Clause and the Accommodations Clause's prohibition on "attempt[ing] to refuse, withhold from, or deny" a service on the basis of sexual orientation ban Chris from explaining on his business' website, social media sites, and directly to prospective clients, his religious beliefs about marriage and what types of wedding photography he provides.

204.    Although Virginia's law restricts Chris' desired activities, it does not apply to other businesses in many situations and makes many exemptions that undermine any basis for compelling Chris to create wedding photography and wedding blog posts celebrating same-sex weddings. *See, e.g.*, Va. Code §§ 2.2-3904(D)(i) (exempting public accommodations from serving individuals under eighteen for any reason), -3905(A)-(B)(1)(a)-(b) (exempting employers with less than fifteen employees from antidiscrimination provisions for some employment decisions), -3905(B)(8) (allowing employers to state preferences in postings for bona fide occupational qualifications).

Virginia's law imposes insurmountable burdens on Chris' wedding photography.

205.    The Accommodations and Publication Clauses impose significant pressures and burdens on Chris and how he operates Chris Herring Photography.

206.    For example, the Accommodations Provision prohibits Chris from maintaining a written editorial policy or unwritten editorial practice of offering only wedding photography services celebrating opposite-sex weddings and engagements.

207.    The Accommodations Clause prohibits Chris from formally adopting Chris Herring Photography's desired Operating Agreement because the Operating Agreement indicates that "it is the Company's policy and practice to not offer, create, or accept any request for photography services that promote or require participation in messages, actions, or events that … celebrate

any marriage other than a marriage between one man and one woman," which Virginia equates to refusing, attempting to refuse, or segregating a service according to sexual orientation.

208.    A true and correct copy of that Operating Agreement is attached to this complaint as Exhibit 1.

209.    Because of the Accommodations Clause, Chris Herring Photography has not and will not formally adopt the Operating Agreement (Exhibit 1).

210.    By forbidding Chris from adopting a written editorial policy, an unwritten editorial practice, or the Operating Agreement that would bind Chris Herring Photography to only accept requests promoting messages consistent with Chris' religious beliefs, the Accommodations Clause undercuts Chris' ability to exercise editorial judgment over his wedding photography and photography business, hinders his ability to plan and operate his business, hinders his ability to bind future owners and employees to promote messages Chris agrees with, and effectively requires Chris to accept projects promoting messages contrary to his beliefs.

211.    The Accommodations Clause also limits Chris' ability to expand his business and more actively advertise his wedding photography.

212.    Chris wants to expand his wedding photography business and advertise more to promote his business and his message about God's design for marriage to more clients and individuals.

213.    But because of the Accommodations Clause, Chris will refrain from expanding his advertising for his wedding photography business after July 1, 2020.

214.    Chris will do so because he does not want to violate the law by attracting requests to photograph same-sex engagements and weddings that he would decline and further increase his risk of being investigated, prosecuted, and punished under Virginia's law.

215.    By refraining from more actively advertising his wedding photography because of the Accommodations Clause, Chris will be unable to create as many photographs on marriage or promote his religious views about God's design for marriage to additional clients or to a broader audience in the way that he desires and is religiously motivated to do.

216.    Chris also will lose profits and business opportunities.

217.    The law also conditions Chris' ability to promote his desired religious beliefs on marriage through his photography and on his blog and Facebook account on his willingness to express viewpoints that violate his religious beliefs.

218.    Because Chris cannot violate his religious beliefs, the Accommodations Clause pressures Chris and those with his beliefs to leave the wedding-photography industry altogether or risk severe penalties.

219.    And Chris cannot afford to create new high-quality wedding photographs, edit those photographs, and publish those photographs with text on his blog and Facebook account without charging a commission.

220.    The Accommodations Clause also hinders Chris' ability to make business planning decisions and operate his business as efficiently as possible.

221.    For example, Chris would like to ask prospective clients whether they are seeking photography services celebrating same-sex engagements or weddings so that he can be upfront with them and let them know he does not create these photographs.

222.    But the Accommodations Clause forbids Chris from asking this question and therefore Chris will have to research every wedding photography request he receives to determine if the request seeks services that violate his beliefs.

223.    Doing this research will take time and effort and reduce the amount of time and effort Christ can spend on promoting and operating his business.

224.    The Accommodations and Publication Clauses also prohibit Chris from posting on his business' website a statement explaining his religious motivations for why his business only promotes marriages between one man and one woman.

225.    A true and correct copy of this statement is attached to the complaint as Exhibit 2.

226.    Chris wants to post this statement to explain his services and beliefs to the public and to prospective clients because Chris is religiously motivated to be upfront and honest with clients, potential clients, and the public (*see supra* ¶¶ 69-70) and he desires to avoid giving any false impression about the services Chris Herring Photography will provide.

227.    Chris also wants to make statements materially similar to Exhibit 2 on his business' Facebook account and directly to prospective clients when called upon to explain his services.

228.    If Chris posted his desired statement (Exhibit 2) or materially similar statements on his business' website or Facebook account or made materially similar statements directly to prospective clients, he would violate the Accommodations Clause and the Publication Clause.

229.    Because of the Accommodations and Publication Clauses, Chris has not and will not post his desired statement (Exhibit 2) or materially similar statements on his business' website or Facebook account or make materially similar statements directly to prospective clients.

230.    If not for the Accommodations and Publication Clauses, Chris would immediately initiate or restart activities motivated by his religious beliefs.

231.    For example, if not for the Accommodations Clause, Chris would immediately sign Chris Herring Photography's Operating Agreement and formally adopt it as a binding editorial policy for his business.

232.    If not for the Accommodations Clause, Chris would immediately advertise his wedding photography more actively after July 1, 2020 so that he could promote his religious views about God's design for marriage to a broader audience by publishing wedding photography content more often on Instagram Stories, using strategic hashtags on Instagram Stories to attract more engagement from new audiences members in the wedding industry, purchasing additional Instagram-related advertising.

233.    If not for the Accommodations Clause, Chris would immediately begin asking prospective clients whether they are seeking photography services for a same-sex engagement or wedding after July 1, 2020.

234.    If not for the Accommodation and Publication Clauses, Chris would immediately post the statement in Exhibit 2 or materially similar statements on his business' website and Facebook account and make materially similar statements directly to prospective clients.

235.    Chris is refraining from these activities (*see supra* ¶¶ 230-34) because he faces a credible threat and substantial risk that he will be investigated or prosecuted under Virginia's law for maintaining his policy and practice of offering wedding photography services only for opposite-sex weddings and engagements and for posting his desired statement or making materially similar statements on his business' website and Facebook account or directly to prospective clients.

236.    Chris is also refraining from these activities because he faces a credible threat and substantial risk that he will receive requests to provide photography services for same-sex engagements or weddings, thereby increasing the chances of his being investigated or prosecuted under Virginia's law because Chris will always decline these requests.

237.    For example, four percent of all weddings in Virginia are same-sex weddings and seven

percent of all weddings in Norfolk are same-sex weddings. *See*

https://www.nbc12.com/2019/09/27/marriages-virginia-have-been-same-sex-unions/.

238.    Likewise, between 2015 and 2018, almost 9,000 same-sex couples have gotten married in

Virginia. *See*

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202015.pdf;

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202016.pdf;

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2017_by_issuance_and_same_sex.pdf;

and

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2018_by_issuance_and_same_sex.pdf.

Virginia's law uses aggressive enforcement mechanisms and devastating penalties.

239.    Virginia's law allows Attorney General Herring and Director Payne to enforce the law

against Chris in numerous ways.

240.    For example, Virginia's law allows the Attorney General to file a civil action in the

appropriate circuit court if he "has reasonable cause to believe that any person or group of

persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights

granted" by Virginia's law. Va. Code § 2.2-3906(A).

241.    The Attorney General considers a public accommodation's policy and practice of

offering expressive services (like photography) celebrating opposite-sex weddings but not same-

sex weddings or declining these services for same-sex weddings while offering them for

opposite-sex weddings to be "a pattern or practice of resistance to the full enjoyment of"

Virginia's law.

242.    In fact, the Attorney General has taken the formal position that public accommodations discriminate on the basis of sexual orientation if they (A) have a policy and practice of offering expressive services celebrating opposite-sex weddings but not same-sex weddings; (B) have a policy and practice of or actually decline to provide expressive services celebrating same-sex weddings while offering them for opposite-sex weddings; or (C) publish communications with the effect of declining expressive services celebrating same-sex weddings but not opposite-sex weddings. *See* Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n* at 29–37, 138 S.Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs., *Telescope Media Grp. v. Lindsey* at 25–28, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316, at *14 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 13–14, 26–27, *303 Creative LLC v. Elenis*, (10th Cir. 2020) No. 19-1413 (Apr. 29, 2020) (same).

243.    Virginia's law also empowers the Attorney General to file a civil action in the appropriate circuit court if he "has reasonable cause to believe … that any person or group of persons has been denied any of the rights granted by this chapter and such denial raises an issue of general public importance." Va. Code § 2.2-3906(A).

244.    The Attorney General considers it an issue of general public importance if a public accommodation offers expressive services (like photography) celebrating opposite-sex weddings but not same-sex weddings or if a public accommodation declines to provide expressive services celebrating same-sex weddings while offering these services for opposite-sex weddings or if a public accommodation publishes communications with the effect of denying these services celebrating same-weddings but not opposite-sex weddings.

245.    In fact, the Attorney General has publicly stated this official position elsewhere. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719 (No. 16-111), 2017 WL 5127307, at *18–23 (joined by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs., *Telescope Media Grp. v. Lindsey*, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316, at *16–20 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 16–22, *303 Creative LLC v. Elenis*, No. 19-1413 (Apr. 29, 2020).

246.    If Chris publishes his belief statement (Exhibit 2) on his business website, he faces a substantial risk that the Attorney General (or someone else) would learn about this statement and seek to enforce the Act against him.

247.    The Attorney General was appropriated additional funds for fiscal year 2020-2021 and 2021-2022 so that additional attorneys "be directed to the Division of Human Rights for enforcement related to" Virginia's law. HB 30, Item # 61, 2020 Reg. Sess. (Va. 2020), https://budget.lis.virginia.gov/get/amendmentpdf/4100/.

248.    In addition, Virginia's law empowers any "person claiming to be aggrieved by an unlawful discriminatory practice" or the Attorney General or Director on behalf of such person to file a complaint with the Division. Va. Code § 2.2-3907(A).

249.    The Division may also "[i]nquire into incidents that may constitute unlawful acts of discrimination" and "[s]eek through appropriate enforcement authorities, prevention of or relief from an alleged unlawful discriminatory practice." Va. Code § 2.2-520(B)(3)-(4).

250.    After receiving a complaint, the Division must serve the complaint on the person alleged to have engaged in an unlawful discriminatory practice (the "Respondent"). Va. Code § 2.2-3907(B); 1 Va. Admin. Code 45-20-20 (defining "Respondent").

251.    Also, after receiving a complaint, the Division must conduct an investigation "to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

252.    During this investigation, the Director has authority to request position statements and additional information from the Respondent, and the Attorney General can compel production of that information. Va. Code § 2.2-521; 1 Va. Admin. Code 45-20-20(A)-(B).

253.    The Director may also hold fact-finding hearings and formal hearings with the complaining party and the Respondent. *See* Va. Code §§ 2.2-520(B)(1), -4020(C)-(D); 1 Va. Admin. Code 45-20-80(C).

254.    Among other things, these hearings require the Respondent's or its counsel's attendance, allow an administrative officer to take evidence, and authorize this officer to make a written determination of whether unlawful discrimination has occurred. *See* Va. Code §§ 2.2-520(B)(1) (authorizing the Division to "hold hearings pursuant to the Virginia Administrative Process Act § 2.2-4000 *et seq*.)"), -4019(A), -4020(C)-(D).

255.    The Division may also use other means during its investigation. 1 Va. Admin. Code 45-20-80(D).

256.    The investigatory process imposes a significant burden on Chris in that the Division is required to investigate every complaint "sufficient to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

257.    This investigation occurs in an adversarial process where any claims of the complaining party are pitted against the Respondent and the Division investigates the Respondent on the complaining party's behalf.

258.    The Division can also compel Respondent to respond to the complaint and supply additional information and participate in informal and formal hearings during its investigation.

259.    The Division's investigation may last up to six months.  Va. Code § 2.2-3907(H).

260.    Once the Division completes its investigation, it issues a reasonable-cause report. Va. Code § 2.2-3907(D).

261.    If the Division's report concludes there is reasonable cause to believe the Respondent committed the alleged unlawful discriminatory practice, the Division "shall immediately endeavor to eliminate any alleged unlawful discriminatory practice by informal methods such as conference, conciliation, and persuasion." Va. Code § 2.2-3907(F).

262.    Because of the severely intrusive nature of the Division's investigative and administrative process, the fear of going through this process will force Chris to stop promoting his religious views about God's design for marriage as he desires, to stop advertising and growing his wedding photography more as he desires, to refrain from adopting Chris Herring Photography's operating agreement, and to lose business opportunities for fear of attracting a complaint to the Division after July 1, 2020.

263.    Likewise, the fear of going through this process has caused Chris to refrain from posting his desired statement (Exhibit 2) or materially similar statements on his business' website or Facebook account or directly to prospective clients. *See supra* ¶¶ 250-59.

264.    If the Division cannot settle the complaint or determines that settlement "is unworkable and should be bypassed," the Division closes the case and gives notice to the complaining party of his or he right to file a civil action. Va. Code § 2.2-3907(F).

265.    At any time after issuing a right-to-sue notice, the Division or the complaining party may petition a court to enjoin the Respondent from doing anything "that would render ineffectual an order that a court may enter with respect to the complainant." Va. Code § 2.2-3907(G).

266.    Once a complaining party receives a right-to-sue notice, he or she may file suit in a general district or circuit court with jurisdiction over the Respondent. Va. Code § 2.2-3908(A).

267.    If a court determines that a public accommodation has violated Virginia's law by committing unlawful discrimination, that court has substantial remedial powers.

268.    In civil actions filed by the Attorney General, the court may find unlawful discrimination and then award remedies including:

- "preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation … as is necessary to assure the full enjoyment of the rights granted by this chapter,"

- a civil penalty "not exceeding $50,000 for a first violation" and "not exceeding $100,000 for any subsequent violation,"

- "compensatory damages and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3906(B)(1)-(3), -3906(C).

269.    Any "aggrieved person" may intervene in an action filed by the Attorney General. Va. Code § 2.2-3906(D).

270.    If an aggrieved party intervenes and the court finds unlawful discrimination has occurred, the court may award the aggrieved person the remedies described in paragraph 271 in addition to remedies awarded to the Attorney General. *See also* Va. Code §§ 2.2-3906(D), -3908(B).

271.    In civil actions filed by an aggrieved person who obtains a right-to-sue notice, the court may find unlawful discrimination and then award remedies to the aggrieved person including:

- "any permanent or temporary injunction, temporary restraining order, or other order, including an order enjoining the defendant from engaging in such practice,"

- "compensatory and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3908(B).

272.    The Attorney General may also intervene in a civil action filed by an aggrieved person if the case is of "general public importance." Va. Code § 2.2-3908(C).

273.    If the Attorney General intervenes in such an action and the court finds that unlawful discrimination has occurred, the court may award the Attorney General the remedies described in paragraph 268 in addition to the remedies awarded to the aggrieved person. *See also* Va. Code § 2.2-3908(B)-(C).

274.    The punitive damages are designed to be especially severe.

275.    For example, Delegate Marcus Simon (D-53) made the following comment during a House General Laws Committee meeting:

> I've actually looked at the [uncapped punitive damages in Virginia's law] language … and I think it's actually doing *exactly* what we intended for it to do. If you don't want to be subject to unlimited punitive damages, don't discriminate on the basis of sexual orientation ….

> I mean, this wasn't meant to be a non-punitive bill. We created a private right of action for a reason. And so I think that the bill accomplishes *exactly* what it's intended to do in the form that it's intended to do it.

*Hearing on SB 868 before the Comm. on Gen. Laws*, 2020 Reg. Sess. (Feb. 13, 2020), available at: https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

276.    As Delegate Simon indicated, the Act is intended to force Chris and people with beliefs like him to choose between either being punished for his religious convictions and risking bankruptcy or abandoning their business altogether.

Virginia's law only bans views the government disfavors.

277.    The Attorney General interprets Virginia's law to allow some public accommodations to decline to create custom expressive works contrary to their creator's artistic or editorial judgment, but the Attorney General requires other public accommodations to create custom expressive works contrary to their creator's artistic or editorial judgment.

278.    For example, the Attorney General interprets Virginia's law as allowing a cakeshop to decline to create custom cakes with "offensive messages about LGBTQ people" based on its non-religious objections but as prohibiting a cakeshop to decline to create a custom wedding cake celebrating a same-sex marriage based on its religious objections. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n* at 27–28, 138 S.Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined by Attorney General Herring).

279.    This distinction treats religious objections to creating expressive works worse than non-religious objections to creating expressive works.

280.    As applied to Chris, Virginia's law prohibits him from promoting and celebrating his religious views about marriage by providing wedding photography services exclusively for engagements and weddings celebrating one man and one woman, but this law allows other wedding photographers to promote and celebrate their views supporting same-sex marriage.

281.    This distinction in treatment is based on the particular view that a photographer holds about marriage and the content that photographer expresses, both through the photographer's services and on the photographer's website.

282.    Many photographers in Virginia offer to photograph opposite-sex and same-sex engagements and weddings.

283.    For example, Wedding Wire is an online service that allows individuals to search for wedding vendors (including wedding photographers), and it lists over 800 wedding

photographers in Virginia: https://www.weddingwire.com/c/va-virginia/wedding-photographers/10-sca.html.

284.    The Wedding Wire's Terms of Use prohibits its vendors—including wedding photographers—from "refusing to provide or accept services" based on sexual orientation. https://www.weddingwire.com/corp/legal/terms-of-use.

285.    Upon information and belief, there are at least over 800 photographers in Virginia who will photograph same-sex and opposite-sex weddings.

286.    Many Virginia-based photographers also promote and celebrate same-sex marriage on their social media sites, blogs, and websites.

287.    For example, many Virginia-based photographers write statements on their websites or social media sites expressing their support for same-sex marriage, their willingness to photograph same-sex weddings, and their celebration of same-sex marriage, and they display photographs of same-sex weddings on their websites, blogs, and social media sites that positively depict and celebrate same-sex weddings.

288.    Chris is in direct competition with the photographers identified above in terms of competing for clients seeking a photographer for opposite-sex engagement sessions or weddings.

289.    But Virginia's law imposes increased regulatory burdens on Chris that it does not impose on these other Virginia businesses.

290.    For example, to avoid being harmed by Virginia's law starting July 1, 2020, Chris must refrain from publishing his desired statement, advertising his business more, adopting certain editorial policies, and tailoring his services and operating his business in certain ways while these other Virginia businesses do not face these burdens because they willingly promote opposite-sex and same-sex weddings.

291.    These differences make it harder for Chris to compete and intensify the competition in the wedding photography market, make it easier for his competition to compete against him, lower the costs and effort other businesses exert when offering wedding photography, illegally structure a competitive environment, make it harder for Chris to promote his business in comparison to these other businesses, and impose a reputational harm on his business that these other businesses do not suffer.

292.    Chris supports the rights of these photographers to communicate their beliefs, to conduct their business in a way that promotes their beliefs and to decline requests for expressive work that is inconsistent with the owners' beliefs.

293.    Chris simply wants to enjoy this same freedom.

Virginia passed its law to target and punish those with Chris' religious beliefs.

294.    Many Virginia legislators have explicitly stated their hostility towards religious beliefs defining marriage as between one man and one woman.

295.    This animosity was evident before Virginia's law passed.

296.    For example, SB 41 2016 was a bill that would have allowed religious persons to object to solemnizing a marriage "in accordance with a sincerely held religious belief … that marriage is or should be recognized as the union of one man and one woman." SB 41, 2016 Reg. Sess. (Va. 2020) https://lis.virginia.gov/cgi-bin/legp604.exe?161+ful+SB41ER+pdf.

297.    Senator Adam Ebbin  (D-30) opposed this bill stating, "[T]his bill carves out a space for bigotry cloaked under the guise of religious freedom." *Debate on SB 41*, 2016 Reg. Sess. (Va. Feb. 12, 2016), available at:

https://www.youtube.com/watch?time_continue=17&v=cBHftN0pEVA&feature=emb_logo.

298.    Senator Ebbin was the chief patron of Virginia's law.

299.    Likewise, HB 773 2016 was a bill that would have prohibited a government entity from making adverse tax, contracting, licensing, entitlement, and certain other decisions "against a person … on the basis that such person believes, speaks, or acts in accordance with a sincerely held religious belief or moral conviction that (i) marriage is or should be recognized as the union of one man and one woman." HB 773, 2016 Reg. Sess. (Va. 2016), https://leg1.state.va.us/cgi-bin/legp504.exe?161+ful+HB773H1+pdf.

300.    Delegate Mark Sickles (D-43) called the bill "a discrimination bill" and explained the bill "authorizes blatant discrimination." *Debate on HB 773*, 2016 Reg. Sess. (Va. Feb. 16, 2016), available at: https://www.youtube.com/watch?v=zFPSrUvs1Q8&feature=youtu.be; Delegate *Mark Sickles' Statement on Passage of HB 773 – "Government Nondiscrimination Act,"* (Feb. 16, 2016), http://www.marksickles.com/press-releases/delegate-mark-sickles-statement-passage-hb-773-government-nondiscrimination-act.

301.    Delegate Simon said the bill was "a license to discriminate." *Debate on HB 773*, 2016 Reg. Sess. (Va. Feb. 16, 2016), available at: https://www.youtube.com/watch?v=Q-0iBqkBWO0

302.    Delegate Charniele Herring (D-46) said the bill gave "a free pass to discriminate." Michael K. Lavers, *Va. House approves 'Kim Davis' religious freedom bill*, Wash. blade (Feb. 16, 2016), https://www.washingtonblade.com/2016/02/16/va-house-approves-kim-davis-religious-freedom-bill/.

303.    Delegate Sam Rasoul (D-11) said the bill "gives state approval to discriminate against others," "sends a terrible message," and "sets an unwelcoming and hostile tone to people." *House passes bill giving businesses license to discriminate against LGBTs*, August Free Press (Feb. 16, 2016), https://augustafreepress.com/house-passes-bill-giving-businesses-license-to-discriminate-against-lgbts/.

304.    The animosity surfaced during debates on Virginia's law.

305.    For example, during a debate in the Virginia House of Delegates over an amendment to

Virginia's law which would have excluded "a religious corporation, association, society, or

unincorporated house of worship" from the definition of public accommodations, Delegate

Joshua Cole (D-28) said:

> I understand we have theological disagreements and we have theological beliefs of what
> we're supposed to carry out, but if you are a public organization, your doors are supposed
> to be open to everyone in the public. Now I don't know what type of Christianity you
> come from, but the type of Christianity I come from, the Apostle Paul said "Try with
> everything within you to live peaceably with all men."
>
> …
>
> The Bible also says "And they shall know us by our love." What are we doing with our
> witness when we allow organizations to say just because we have St. Peter's behind it, or
> Christian behind it, … that we don't like you so don't come over here…. Madame
> Speaker as an ending thought, I will let you know that in Jesus' day the sinner was not his
> enemy. It was the church.

*Debate on HB 1663*, 2020 Reg. Sess. (Va. March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

306.    During that same debate, Delegate Mark Levine (D-45) stated that "religious bigotry is

bad" which in context implied that religious organizations who had objections to hiring someone

because of their sexual orientation were bigoted. *Debate on HB 1663*, 2020 Reg. Sess. (Va.

March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php

307.    Upon information and belief, many legislators applauded after both of these statements.

308.    Likewise, the Virginia legislature rejected amendments to SB 868 2020 which would

have (1) allowed "a religious organization" to "require that all employees or applicants for

employment conform to the religious tenets of such organization"; (2) exempted "a religious

corporation, association, educational or charitable institution, or society from taking such action

as it deems necessary to promote the religious principles by which it is established or

maintained"; and (3) allowed "a religious organization, association, or society, or any  nonprofit

institution or organization operated, supervised, or controlled by or in conjunction with a

religious organization, association, or society, from taking such action as it deems necessary to

promote the religious principles by which it is established or maintained." SB 868, 2020 Reg.

Sess., (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868AHR and

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868ASR.

309.    The Virginia legislature also failed to enact HB 1663 2020 due to a Senate amendment

which would have exempted (1) religious organizations from "provid[ing] employment that

would be inconsistent with its deeply held religious beliefs regarding sexual orientation" and (2)

"a religious corporation, association, society or unincorporated house of worship" from the

definition of a public accommodation. HB 1663, Reg. Sess. (Va. 2020),

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+HB1663ASR.

310.    And the animosity manifested after passing Virginia's law.

311.    For example, in a committee meeting on HB 1049 2020, Jeffrey Caruso of the Virginia

Catholic Conference proposed an amendment to the bill because the "religious tenets of our

organization would be that, that marriage is the union of a man and a woman and we would

expect that employees of our organization would adhere to that standard of conduct." *Hearing on

HB 1049 before the Comm. on Gen. Laws and Tech.*, 2020 Reg. Sess. (Va. Feb. 19, 2020),

available at: http://virginia-

senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&e

Id=a892ddee-6f76-4e77-b55f-cf72688553c6.

312.    Senator Ghazala Hashmi (D-10) responded, "I just have a real problem with that line of argument. As a Commonwealth, we are committed to nondiscrimination…. And so I have an issue with that argument." *Hearing on HB 1049 before the Comm. on Gen. Laws and Tech.*, 2020 Reg. Sess. (Feb. 19, 2020), available at: http://virginia-senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&eId=a892ddee-6f76-4e77-b55f-cf72688553c6.

313.    All of the state representatives listed in paragraphs 297–312 voted in favor of passing Virginia's law. SB 868, 2020 Reg. Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+mbr+SB868.

**Legal Allegations**

314.    Plaintiffs are subject to and must comply with Virginia's Accommodations and Publication Clauses.

315.    These clauses violate, chill, and deter Plaintiffs from exercising their constitutional rights.

316.    As a direct and proximate result of the Defendants' violation of the Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief.

317.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

318.    Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

First Cause of Action
First Amendment: Freedom of Speech, Association, and Press

319.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-318 of this complaint.

320.    The First Amendment's Free Speech and Press Clauses protects Plaintiffs' ability to speak, create speech, publish speech, sell speech, distribute speech, and associate with others for expressive purposes.

321.    The First Amendment also protects Plaintiffs' ability to not speak, to exercise editorial control over their speech, to decline to create speech, to decline to publish speech, to decline to sell speech, to decline to distribute speech, and to decline to associate with others and with other messages for expressive purposes.

322.    The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination.

323.    The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

324.    Plaintiffs' wedding photography, and all activities associated with this service, are forms of protected speech and expressive association, and Plaintiffs publish their speech to the public.

325.    As applied to Plaintiffs, the Accommodations Clause compels speech Plaintiffs object to, interferes with their editorial judgment, compels them to sell, publish, and disseminate speech they object to, compels them to engage in expressive associations they deem objectionable, forbids them from tailoring their business and advertising, and regulates speech, association, and publication based on content, viewpoint, and speaker identity.

326.    As applied to Plaintiffs, the Accommodations Clause is a content, viewpoint, and speaker-based regulation that prevents Plaintiffs from adopting and openly declaring their desired pattern and practice of creating wedding photography only promoting marriage between one man and one woman and of declining to create wedding photography promoting marriages other than those between one man and one woman and that bans, chills, and burdens Plaintiffs'

desired speech, publication, and association by requiring Plaintiffs to engage in objectionable speech, associations, and publishing if they wish to engage in speech, associations, and publication they desire.

327.   As applied to Plaintiffs, the Accommodations Clause conditions their ability to participate in the wedding industry and to create wedding photography promoting marriage between one man and one woman on the requirement that Plaintiffs also create wedding photography promoting marriages other than those between one man and one woman.

328.   As applied to Plaintiffs, the Accommodations and Publication Clauses are a content, viewpoint, and speaker-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and publication of that speech) on Chris Herring Photography's website, on Chris Herring Photography's social media sites, and directly to prospective clients, and that inhibits Plaintiffs from forming expressive associations they desire to form and from avoiding expressive associations that want to avoid.

329.   Plaintiffs have not and will not engage in certain protected speech because of the Accommodations and Publication Clauses.

330.   If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to engage in this protected speech again.

331.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free speech, free association, and free press rights.

332.   Accordingly, as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections for free speech, free association, and free press.

### Second Cause of Action
### First Amendment: Free Exercise of Religion

333.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-332 of this complaint.

334.    The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

335.    The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

336.    Plaintiffs exercise their religion under the First Amendment when they operate their business, adopt patterns and practices consistent with their religious beliefs, exercise their editorial judgment consistent with their religious beliefs, honestly communicate with clients and prospective clients about the photography they can and cannot create, participate in wedding ceremonies, and celebrate marriages between one man and one woman.

337.    As applied to Plaintiffs, the Accommodations and Publication Clauses substantially burden Plaintiffs' sincerely held religious beliefs by requiring them either to operate their expressive business in ways that violate their religious beliefs or close their business in violation of their religious beliefs, by preventing them from maintaining patterns and practices consistent with their religious views on marriage, by stopping them from being honest with prospective clients and clients by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech, by compelling speech that

they are religiously obligated to avoid, and by forcing their participation in activities prohibited by their religious beliefs.

338.   The Accommodations and Publication Clauses do not force nonreligious persons and businesses to choose between these same options when faced with requests to promote messages they disagree with or when they must decide how to explain why they decline to promote certain messages.

339.   The Accommodations and Publication Clauses impermissibly prefer some religious views over others by allowing those who own and operate public accommodations to express religious beliefs in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

340.   The Accommodations and Publication Clauses are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiffs due to their religious beliefs.

341.   The Accommodations and Publication Clauses are not neutral or generally applicable because they contain several categorial exemptions, yet Defendants refuse to grant a religious exemption to Plaintiffs.

342.   The Accommodations and Publication Clauses also violate Plaintiffs' free exercise rights under the hybrid rights doctrine because they implicate free exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, and press.

343.   The Accommodations and Publication Clauses impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs and to stop operating their business according to their religious beliefs.

344.    Plaintiffs have not and will not engage in certain religiously motivated conduct because of the Accommodations and Publication Clauses.

345.    If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to act in ways motivated by their religious beliefs.

346.    The Accommodations and Publication Clauses are also facially unconstitutional because they regulate and prohibit certain activities because they are undertaken for religious reasons, ban activities only because of the religious beliefs those activities display, disfavor a particular religion, target a specific religious belief for punishment, have the object of singling out a disfavored religious belief for punishment, were promulgated to achieve these goals, and were promulgated based on hostility toward particular religious views.

347.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise their religion.

348.    Accordingly, both facially and as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections to freely exercise religion.

<u>Third Cause of Action</u>
<u>First Amendment: Establishment Clause</u>

349.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-348 of this complaint.

350.    The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

351.    The Accommodations Clause forces Plaintiffs to participate in religious exercises contrary to their sincere religious beliefs.

352.     Defendants do not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs.

353.     Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections to be free from religious establishments.

## Prayer for Relief

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.     A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

> a.   enforcing the Accommodations and Publication Clauses as applied to Plaintiffs' constitutionally protected speech, association, free press, religious exercise rights, and their right to be free from religious establishments; and

> b.   enforcing the Accommodations and Publication Clauses facially because they were adopted based on religious hostility.

2.     A declaration that the Accommodations and Publication Clauses violate and are currently violating Plaintiffs' First Amendment rights under the United States Constitution to engage in speech, association, press, free exercise of religion, and to be free from the establishment of religion as applied to Plaintiffs' constitutionally protected activities;

3.     A declaration that the Accommodations and Publication Clauses facially violate the United States Constitution's First Amendment protections for free exercise of religion because they were adopted based on religious hostility;

4.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.      That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.      That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

8.      That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 30th day of June, 2020.

By: _s/_ Steve Taylor

Jonathan A. Scruggs
Arizona Bar No. 030505*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 258
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

Steve C. Taylor
Virginia Bar No. 31174
**Law Office of Steve C. Taylor**
133 Mount Pleasant Road
Chesapeake VA 23322
(757) 482-5705
(757) 546-9535 (facsimile)
stevetaylor@call54legal.co

L. Carter Budwell
Virginia Bar No. 90593
**The Alliance Legal Group**
735 E. Newtown Road # 203
Norfolk, Virginia 23502
(757) 455-9590
(757) 455-9591
carter@call54legal.com

ATTORNEYS FOR PLAINTIFFS

*Motions for _Pro Hac Vice_ admission filed concurrently

## DECLARATION UNDER PENALTY OF PERJURY

I, CHRIS HERRING, a citizen of the United States and a resident of the State of Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _____ day of _____, 2020, at _____, Virginia.


_____
CHRIS HERRING