**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

**Chris Herring Photography LLC**; and
**Chris Herring**,

                  Plaintiffs,

   v.

**Mark R. Herring**, in his capacity as Virginia
Attorney General; and **R. Thomas Payne, II**,
in his capacity as Director of Virginia
Division of Human Rights and Fair Housing,

                Defendants.

Case No. _____ 2:20-cv-00353

**Brief in Support of Plaintiffs'**
**Motion for Preliminary Injunction**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Introduction .................................................................................................................. 1

Statement of Facts ........................................................................................................ 2

Argument ...................................................................................................................... 7

I.    The law violates the First Amendment because it compels Chris to speak and
      infringes his editorial discretion .......................................................................... 8

      A.    Chris engages in protected speech. .......................................................... 9

      B.    The Accommodations Clause compels Chris to speak. ......................... 11

      C.    The Accommodations Clause compels Chris to speak messages he
            objects to. .............................................................................................. 15

      D.    Forcing Chris to speak creates a dangerous and limitless principle. .... 19

II.   The law violates the First Amendment because it regulates Chris' speech based
      on content and viewpoint. ................................................................................. 20

      A.    The Accommodation Clause compels speech based on content and
            viewpoint. .............................................................................................. 21

      B.    The Publication Clause restricts speech based on content and viewpoint. ........... 22

III.  The law violates the First Amendment because it compels Chris to participate
      in and celebrate religious ceremonies he disagrees with. ................................. 23

IV.   The law violates the First Amendment because it restricts a hybrid of historically
      protected rights .................................................................................................. 25

V.    The law fails strict scrutiny as applied to Chris' expression and participation. ............... 26

      A.    Virginia does not have a compelling interest to force Chris to celebrate
            same-sex weddings. ............................................................................... 26

      B.    The law lacks narrow tailoring. ............................................................. 28

VI.   The remaining preliminary injunction factors favor granting an injunction .................... 29

Conclusion .................................................................................................................. 30

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051(9th Cir. 2010) ..................................................................................10, 24

*Anderson v. Laird,*
  466 F.2d 283 (D.C. Cir. 1972)..................................................................................10, 24

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ..........................................................................................................28

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004)........................................................................................25

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996)..................................................................................................9

*Billups v. City of Charleston,*
  No. 19-1044, 2020 WL 3088108 (4th Cir. June 11, 2020) ..................................................10

*Boy Scouts of American v. Dale,*
  530 U.S. 640 (2000) ..........................................................................................................19

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) ........................................................................................9, 10, 27, 28

*Brush & Nib Studio, LC v. City of Phoenix,*
  448 P.3d 890 (Ariz. 2019) ..............................................................................12, 14, 15, 18

*Campbell v. Robb,*
  162 F. App'x 460 (6th Cir. 2006)....................................................................................22

*Centro Tepeyac v. Montgomery County,*
  722 F.3d 184 (4th Cir. 2013)..........................................................................................7, 8

*Claybrooks v. American Broadcasting Companies, Inc.,*
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) ..........................................................................13

*Cressman v. Thompson,*
  798 F.3d 938 (10th Cir. 2015)............................................................................................9

*Cut 'N Dried Salon v. Department of Human Rights,*
  713 N.E.2d 592 (Ill. App. Ct. 1999)..................................................................................29

*Elrod v. Burns,*
  427 U.S. 347 (1976) ..........................................................................................................30

*Employment Division, Department of Human Resources of Oregon. v. Smith*,
   494 U.S. 872 (1990) ................................................................................25

*Fields v. City of Philadelphia*,
   862 F.3d 353 (3d Cir. 2017) ....................................................................10

*Freedom Watch, Inc. v. Google*,
   No. 19-7030, 2020 WL 3096365 (D.C. Cir. May 27, 2020) ....................29

*Fulton v. City of Philadelphia*,
   93 F. Supp. 2d 649 (E.D.N.C. 1999) .......................................................26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................................26

*Greater Baltimore Center. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
   879 F.3d 101 (4th Cir. 2018), *cert. denied*, 138 S. Ct. 2710 (2018)................11, 20

*Hicks ex rel. Hicks v. Halifax County Board of Education*,
   93 F. Supp. 2d 649 (E.D.N.C. 1999) .......................................................25

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ...................................................................... *passim*

*Janus v. American Federation of State, County., & Municipal Employees, Council 31*,
   138 S. Ct. 2448 (2018) ........................................................................15, 18

*Kaahumanu v. Hawaii*,
   682 F.3d 789 (9th Cir. 2012) ..............................................................24, 25

*Kania v. Fordham*,
   702 F.2d 475 (4th Cir. 1983) ...................................................................13

*Kaplan v. California*,
   413 U.S. 115 (1973) ..................................................................................9

*Lee v. Weisman*,
   505 U.S. 577 (1992) ............................................................................23, 24

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ...................................................................30

*Marrero-Mendez v. Calixto-Rodriguez*,
   830 F.3d 38 (1st Cir. 2016) ......................................................................24

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
   138 S. Ct. 1719 (2018) .........................................................................23, 27

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........................................................................................20

*McDermott v. Ampersand Publishing, LLC*,
593 F.3d 953 (9th Cir. 2010) ....................................................................13, 20

*Melvin v. U.S.A. Today*,
No. 3:14-CV-00439, 2015 WL 251590 (E.D. Va. Jan. 20, 2015)..................11, 13

*Miami Herald Publishing Company v. Tornillo*,
418 U.S. 241 (1974) ...............................................................8, 13, 14, 15, 21

*Newsom ex rel. Newsom v. Albemarle County School Board*,
354 F.3d 249 (4th Cir. 2003) ..........................................................................8, 30

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015) .....................................................................................18

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
475 U.S. 1 (1986) .....................................................................................9, 21, 22

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) .....................................................................................10

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .....................................................................................20, 26

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988)...................................................................................10, 15, 21

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) .....................................................................................22, 23

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) ..........................................................................21

*Telescope Media Group v. Lucero* (*TMG*),
936 F.3d 740 (8th Cir. 2019) ................................................................... *passim*

*Tucker v. California Department of Education*,
97 F.3d 1204 (9th Cir. 1996)..........................................................................23

*Turner Broadcasting System, Inc. v. F.C.C.*,
512 U.S. 622 (1994) .....................................................................................22

*Turner v. Safley*,
482 U.S. 78 (1987) ...........................................................................................24

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................................................................9

*Vejo v. Portland Public Schools*,
    204 F. Supp. 3d 1149 (D. Or. 2016) .....................................................................29

*Vejo v. Portland Public Schools*,
    737 F. App'x 309 (9th Cir. 2018) ..........................................................................29

*Washington Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) .................................................................................11

*West Virginia Association of Club Owners & Fraternal Services., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) .............................................................................8, 29

*Western Watersheds Project v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) .............................................................................10

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ................................................................................................8

*World Peace Movement of America v. Newspaper Agency Corporation*,
    879 P.2d 253 (Utah 1994) .....................................................................................19

*Zhang v. Baidu.Com Inc.*,
    10 F. Supp. 3d  (S.D.N.Y. 2014) .............................................................................3

## **Statutes**

42 U.S.C. § 2000 a(b) ....................................................................................................29

42 U.S.C. § 2000 e–2(e)(1) ...........................................................................................28

29 C.F.R. § 1604.2 .........................................................................................................28

Colo. Rev. Stat. § 24-34-601(3) .....................................................................................28

Fla. Stat. § 760.02(11) ...................................................................................................29

Miss. Code § 11-62-5(5)(a) ............................................................................................28

S.C. Code. Ann. § 45-9-10(B) ........................................................................................29

Va. Code § 2.2-520(B) ......................................................................................................6

Va. Code § 2.2-3904 .........................................................................5, 6, 7, 11, 12, 22, 27

Va. Code § 2.2-3905 ...............................................................................................27, 28

Va. Code § 2.2-3906 .................................................................................................6, 7, 12

Va. Code § 2.2-3907 ..........................................................................................................6

Va. Code § 2.2-3908 ..........................................................................................................6

Va. Code § 36-96.2(A).....................................................................................................27

1 Va. Admin. Code 45-20-80-C.........................................................................................6

## Other Authorities

Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for Discriminatory*
    *Rejection of Noncommercial Ad in Its Publication*,
    The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7. ...................................20

**Introduction**

Across the country, paid speakers regularly exercise their editorial freedom to choose what they can and cannot say. Artists can choose to paint landscapes, not portraits. Newspapers can choose to publish op-eds about protests, not cooking. Web designers can promote coffee shops, but not strip clubs. The question in this case is whether speakers can exercise the same editorial freedom to express a view about marriage that state officials dislike—that marriage should be between a man and a woman.

A recent Virginia law says no, which puts Plaintiff Chris Herring in a bind. Chris is a seminary student, youth-group pastor, and photographer trying to earn a living doing what he loves—photographing and blogging about nature and weddings. Like other speakers, Chris offers his services to anyone no matter who they are; he just cannot promote certain content in his photographs and blogs for anyone. That means Chris cannot create photographs or blogs that violate his Christian beliefs, whether that be artwork promoting pornography, pollution, or any marriage not between one man and one woman.

But because Chris creates photographs and blogs about opposite-sex weddings, a recent Virginia law requires Chris to do the same to celebrate same-sex weddings. So if Chris offers wedding services to only celebrate opposite-sex weddings, adopts a written policy formalizing this choice, asks questions to carry out this policy, or has his company website explain why he cannot celebrate same-sex weddings, Virginia can prosecute him—penalizing him with lawsuits, injunctive orders, unlimited damage and attorney-fee awards, and fines up to $50,000 initially and then $100,000 for each subsequent violation.

This forces Chris to chill his speech and operate his business under constant threat. But Virginia cannot compel Chris' speech, censor his views, or force him to participate in weddings without violating the First Amendment and undermining everyone's editorial freedom. So Chris

1

asks this Court to stop these ongoing violations and to temporarily enjoin Virginia's law as applied to his photography and blogging.

## Statement of Facts

For Chris Herring, faith and work cannot be separated. Chris has always loved the outdoors and developed his interest in photography during college. Compl. ¶¶ 23–26. Photographing nature and human interactions led Chris to a deeper appreciation of God and His design for the world. *Id.* ¶ 27. As a Christian, Chris believes that God has given every person a unique set of gifts and called us to be good stewards by using our talents to honor Him. *Id.* ¶ 67. Chris believes that God has given him a passion for sharing the Gospel and a gift for creating aesthetically pleasing works of art. *Id.* ¶ 68. Through photography, Chris tries to point people to God by showcasing the beauty of His creation. *Id.* ¶¶ 29–34.

This led Chris to start a photography business and eventually form Chris Herring Photography LLC, which offers adventure and wedding photography to the public.[1] *Id.* ¶ 47. Adventure photography involves photographing scenic landscapes, diverse peoples, and traveling across the world to capture the beauty and breadth of God's creation. *Id.* ¶¶ 50–51. Chris typically creates these photographs for organizations like travel agencies, hostels, outdoor adventure brands, and coffee companies to use in their advertisements. *Id.* ¶ 52.

For his wedding photography, Chris captures engagements and weddings. *Id.* ¶ 59. This photography has three parts. First, Chris photographs the couple's engagement or wedding. *Id.* Second, Chris curates and edits the photographs. *Id.* ¶ 60. Third, Chris posts some of the finished photographs on his website or social media accounts with text celebrating the wedding.

---

[1] Unless context indicates otherwise, the remainder of the memorandum refers to Chris Herring Photography LLC as "Chris Herring Photography" and to all plaintiffs collectively as "Chris."

*Id.* ¶ 61. *See* Appendix (App.) at 379–406. Chris bundles the photography, editing, and blogging as one package so that he and his clients can more fully celebrate the couple's marriage to as many people as possible. Compl. ¶ 62.

Promoting God's design for marriage is central to Chris' business. Chris uses his skills to portray marriage positively and to convince his audience that marriage is something they should pursue and value. *Id.* ¶¶ 80–83. Chris does this by capturing authentic moments that display the couple's love, excitement, and spontaneous affection for each other. *Id.* ¶¶ 97–101. So his photography involves countless decisions about what and how to photograph to promote his message. Decl. ¶ 80. For instance, Chris directs the couple, the wedding party, and the couple's family on how to pose in relation to empty space while considering the ambient light, color temperature, and the capacities of his camera. *Id.* ¶ 81 When Chris edits the photos, he adjusts elements like white balance to alter a photograph's tint and exposure, and he adjusts the image's color to alter the hue, saturation, and luminance. *Id.* ¶ 84.

Chris desires to honor God in everything his business creates. Compl. ¶¶ 73–74 For this reason, Chris does not offer adventure or wedding photography that dishonors God or requires him to participate in events contrary to his religious beliefs. *Id.* ¶¶ 163–65. For instance, Chris will not provide adventure photography to travel agencies promoting red-light districts or tourism boards promoting drug tourism. *Id.* ¶ 160. Nor will Chris take photographs that promote sexually explicit acts or that glorify pollution. *Id.* And Chris will only provide wedding photography that celebrate marriages consistent with his faith. *Id.* ¶ 163. For instance, Chris believes that a wedding is a sacred celebration of the union between one man and one woman. *Id.* ¶¶ 161–62. So Chris will not create photographs that devalue the sacredness of marriage or that celebrate same-sex, polygamous, or open relationships. *Id.* ¶¶ 159, 161.

Chris also believes that all wedding ceremonies are inherently religious events and that he participates in these ceremonies when photographing them. *Id.* ¶¶ 164–66. For example, every wedding Chris has photographed has included prayers, a procession, a homily, an exchange of vows, and a pronouncement of marriage. *Id.* ¶ 115. Chris always says "amen" at the end of prayers and acts as a witness before God to the marriage. *Id.* ¶¶ 118, 121. Chris also greets and encourages guests, directs the wedding party and the bride and groom's families on how to stand and position themselves, and encourages the bridal couple throughout the wedding day. *Id.* ¶¶ 108, 125–27.

Although Chris believes marriage should be between a man and a woman, he is happy to provide services to those in the LGBT community. *Id.* ¶ 170. For example, Chris has provided his adventure photography to individuals and business representatives without ever knowing their sexual orientation, and he would gladly provide these services to LGBT persons in the future. *Id.* ¶¶ 171–76. Chris would also provide wedding photography if requested by someone who identifies as LGBT—whether a gay parent asking for a son's wedding to a woman or a bisexual woman asking for her own wedding to a man. *Id.* ¶¶ 174–76. Chris just cannot promote messages or participate in ceremonies that violate his beliefs for anyone, no matter their status. *Id.* ¶¶ 181–82.

To ensure his company expresses messages consistent with his beliefs, Chris wants to take certain steps. First, Chris wants to only offer and create wedding photographs and blogs celebrating opposite-sex weddings. *Id.* ¶ 166. Next, Chris wants to adopt an operating agreement that formalizes his editorial decision and binds his business to only create messages consistent with his beliefs about marriage. *Id.* ¶¶ 207–09; Ex. 1 (operating agreement Chris wants to adopt). Third, Chris wants to be upfront and honest with the public about what artwork

he creates. *Id.* ¶ 221. So he wants to publish a statement on his website explaining his inability to celebrate same-sex weddings. *Id.* ¶¶ 228–29; Ex. 2 (statement Chris wants to publish). Fourth, Chris wants to ask prospective clients if they are asking him to create content that would violate his religious beliefs. *Id*. ¶ 221.

According to Virginia though, Chris cannot do any of this.

Effective July 1, 2020, the Virginia Values Act revises the Virginia Human Rights Act ("Virginia's law" or "the law"), Va. Code § 2.2-3904 *et seq.*, and adds two provisions relevant here. First, the Accommodations Clause makes it unlawful for public accommodations like Chris Herring Photography "to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny any individual, directly or indirectly, … or to segregate or discriminate against any [] person in the use [of]" any "advantages, … services, or privileges made available in any place of public accommodation … on the basis of … sexual orientation …." *Id.* at § 2.2-3904(B). Second, the Publication Clause makes it unlawful "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, … privileges, or services of any such place [of public accommodation] shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation." *Id.*

The Virginia Attorney General has already interpreted similar laws in other states to require businesses like Chris' to offer the same expressive works celebrating same-sex marriage as they offer for opposite-sex weddings. Br. of Mass. et al. as Amici Curiae Supporting Defs. at 12, *303 Creative LLC v. Elenis* (10th Cir. 2020) (No. 19-1413) (similar law "requires that businesses offering their services to the public make wedding websites for LGBTQ customers if, and to the extent that, they make wedding websites for other customers."); Br. of Mass. et al.

as Amici Curiae Supporting Defs. at 14, *Telescope Media Group v. Lucero* (*TMG*), 936

F.3d 740 (No. 17-3352), 2018 WL 1414316, at *14 (similar law "requires that [videographers]

make wedding videos for LGBTQ customers if, and to the extent that, they make wedding

videos for other customers.") The Virginia Attorney General has also interpreted these laws to

require businesses to treat requests for artwork celebrating same-sex weddings the same as

requests to celebrate opposite-sex weddings and to not post statements declining to create

expressive works celebrating same-sex weddings. *Id.*

Meanwhile, Virginia's law allows the Attorney General to file a civil suit against anyone

he reasonably believes is "engaged in a pattern or practice of resistance to the full enjoyment"

of rights granted by the law. Va. Code § 2.2-3906(A). The law also allows the Attorney General

to obtain a temporary or permanent injunction, attorney fees and costs, penalties of $50,000 for

the first violation, and up to $100,000 for each additional violation, and damages. *Id.* at § 2.2-

3906(B).

Adding to that, the law allows the Attorney General, private individuals, or the Division

of Human Rights to file a complaint with this Division. *Id.* at § 2.2-3907(A). This complaint

triggers an administrative process that may include fact-finding, hearings, investigation, and

conciliation attempts. *See* Va. Code §§ 2.2-520 (B); -3907(D), -4020(C)-(D); 1 Va. Admin.

Code 45-20-80(C). If the Division cannot settle the dispute, it issues the complainant a notice

allowing them to file a civil action. Va. Code § 2.2-3907(F). In this civil action, a private citizen

may recover injunctions, compensatory and punitive damages, and costs and attorney fees. *Id.* at

§ 2.2-3908(B).

Putting all this together, the Accommodation Clause uses these penalties to force Chris

to offer and create photographs and blogs celebrating same-sex weddings since he offers and

creates photographs and blogs celebrating opposite-sex weddings. *Id.* at § 2.2-3904(B) (making it illegal to "withhold," "attempt to … withhold," or "segregate" services). Next, the Accommodation Clause forbids Chris from adopting his desired operating agreement because that binds his company to only offer and create wedding photographs and blogs celebrating opposite-sex weddings. *Id.* at § 2.2-3906(A) (making persons liable for "pattern or practice of resistance to the full enjoyment" of rights protected by law). Third, the Accommodations Clause forbids Chris from asking clients whether they seek services celebrating same-sex weddings. *Id.* at § 2.2-3904(B) (making it illegal to "attempt to … withhold," or "segregate" services). And Fourth, the Accommodations and Publication Clauses forbid Chris from posting his desired internet statement declining to create artwork celebrating same-sex weddings. *Id.* (making it illegal to "attempt to … withhold" services or "publish … any communication … to the effect that … services … shall be refused").

Starting July 1, 2020, Chris will continue to photograph weddings between one man and one woman but will have to operate his business in constant fear of violating the law, being investigated and prosecuted, and suffering the penalties mentioned above. So starting July 1, Chris will refrain from adopting his desired operating agreement, publishing his desired internet statement, and asking clients his desired questions about same-sex weddings. Compl. ¶¶ 207–09, 221–23, 226–31. Similarly, after July 1, Chris will refrain from expanding any wedding advertising for his business to avoid attracting requests to celebrate same-sex weddings, which would also increase his risk of prosecution. *Id.* ¶¶ 213–14.

### **Argument**

Chris seeks a preliminary injunction to stop the ongoing violation of his First Amendment rights. For this relief, plaintiffs must prove they will likely succeed on the merits,

they will likely suffer irreparable harm without an injunction, the balance of equities tips in their favor, and the injunction serves the public interest. *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (cleaned-up). When the movant alleges a First Amendment violation though, likelihood of success becomes most important. *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (because irreparable harm for First Amendment claim is "inseparably linked" to likelihood of success, courts "focus our review on the merits of plaintiff's First Amendment claim"); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 254–55 (4th Cir. 2003) (same).

Focusing on this factor, Chris deserves his requested injunction for six reasons: (I) Virginia's law compels him to speak a message he disagrees with, (II) the law regulates his speech based on content and viewpoint, (III) the law forces him to celebrate and participate in religious ceremonies he objects to, (IV) the law regulates a hybrid of rights, (V) Virginia's actions trigger and fail strict scrutiny, and (VI) these First Amendment violations satisfy the remaining preliminary injunction factors.

## I. The law violates the First Amendment because it compels Chris to speak and infringes his editorial discretion.

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This right means speakers have editorial discretion to choose the content of their speech. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974), 258 (1974) (First Amendment protects "the function of editors" in their "exercise of editorial control and judgment"). These protections originate in the individual's personal autonomy and "individual freedom of mind." *Wooley*, 430 U.S. at 714 (cleaned-up).

A compelled speech claim has three elements: 1) speech, 2) the government compels, 3) and the speaker objects to. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572–73 (1995) (applying elements); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (identifying elements). Virginia's law compels Chris to speak a message he disagrees with by requiring him to photograph and blog to promote same-sex weddings. This triggers strict scrutiny. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.* (*PG&E*), 475 U.S. 1, 19 (1986) (plurality) (applying strict scrutiny to law compelling speech).

### A.      Chris engages in protected speech.

The First Amendment protects mediums like "books, plays, and movies [that] communicate ideas." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). This standard covers Chris' photographs and blogs.

*Photographs*: The Supreme Court has repeatedly "applied … First Amendment standards … to photographs." *Kaplan v. California*, 413 U.S. 115, 119–20 (1973). *Accord United States v. Stevens*, 559 U.S. 460, 468 (2010) (regulation on "'visual [and] auditory depiction[s],' such as photographs" regulated speech). Indeed, "paintings, photographs, prints and sculptures … always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection." *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996). Chris' photographs are no exception; they depict and encourage others to value the beauty and joy of marriage and weddings and therefore deserve protection. Compl. ¶¶ 79–80. *See also* App. at 45–113 (examples of Chris' engagement and wedding photographs).

*Blogs*: Like photographs, "printed word[s] have First Amendment protection." *Kaplan*, 413 U.S. at 119–20. Here, Chris writes and then posts celebratory words and photographs on his website or social media to celebrate the engagements and weddings and to express his happiness

for the couple. Compl. ¶¶ 135–39; Decl. ¶ 86; App. at 134–37 (examples of Chris' blog posts). Writing and posting these words and photographs on the internet also deserves protection. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) ("In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'").

*Creating Photographs and Blogs*: Because Chris' photographs and blogs deserve protection, the process of creating these photographs and blogs deserves protection too. "Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 131 S. Ct. at 2734 n.1. The reason is simple. "Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). We simply don't "disaggregate Picasso from his brushes and canvas" or divide "Beethoven" from his "strings and woodwinds." *Id.* (protecting tattoo creation under First Amendment). The same logic applies to creating photographs and written works like blogs. *Id.* ("the act of setting the type" protected as much as essays themselves); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) (protecting photography creation); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) (protecting photography and note-taking creation).

What's more, it doesn't matter that clients pay Chris for his services. "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988); *Billups v. City of Charleston,* No. 19-1044, 2020 WL 3088108, at *6 (4th Cir. June 11, 2020) (protecting paid tour-guide services) (cleaned up)). Chris' photographs and

blogs convey a message whether Chris is paid or not. That is decisive for First Amendment purposes.

**B.     The Accommodations Clause compels Chris to speak.**

Compelled speech occurs when the government infringes a speaker's "autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 572–73. The "general rule" is that speakers have a "right to tailor [their] speech" to express messages they want. *Washington Post v. McManus*, 944 F.3d 506, 519 (4th Cir. 2019) (cleaned-up).

For example, officials cannot force pro-life centers to display signs about abortion-referrals because that would convey a message "antithetical to the very moral, religious, and ideological reasons the Center exists." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 110–11 (4th Cir. 2018), *cert. denied*, 138 S. Ct. 2710 (2018). Campaign-finance laws cannot force online publishers to disclose information about political advertisements because that would force "publishers to speak in a way they would not otherwise." *McManus*, 944 F.3d at 518. And anti-discrimination laws cannot force newspapers to publish articles from protected groups because that would undermine freedom "at the heart of editorial discretion protected by the First Amendment"—"the power to decide whether to speak on any particular subject." *Melvin v. U.S.A. Today*, No. 3:14-CV-00439, 2015 WL 251590, at *4 (E.D. Va. Jan. 20, 2015).

Virginia's Accommodations Clause threatens Chris' editorial freedom in similar ways. This Clause makes it illegal for public accommodations to (1) "withhold from, or deny… any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation … on the basis of … sexual orientation"; (2) to "attempt to" do this; or (3) to "segregate or discriminate" in the use of these services on the basis of sexual

orientation. Va. Code § 2.2-3904(B). A mere "pattern or practice" of resisting "the rights granted by" these requirements subjects someone to liability. *Id.* at § 2.2-3906(A).

But Virginia interprets these provisions to require more than equal treatment regardless of status. Virginia demands special treatment for certain content—that paid speakers offer the same photography services to celebrate same-sex weddings as they do to celebrate opposite-sex weddings. *See* Br. of Mass. et al. as Amici Curiae Supporting Defs. at 10, *303 Creative LLC v. Elenis*, (10th Cir. 2020) (No. 19-1413) (arguing that web-designer violated public accommodations law by creating websites celebrating opposite-sex weddings and not same-sex weddings); Br. of Mass. et al. as Amici Curiae Supporting Defs. at 11–12, *TMG*, 936 F.3d 740 (No. 17-3352) (arguing that film studio violated public accommodations law by offering films celebrating opposite-sex weddings and not same-sex weddings ); *see also Telescope Media Group v. Lucero* (*TMG*), 936 F.3d at 748 (Minnesota interpreting a similar law to mean that filmmakers' decision to make "any wedding videos requires the [filmmakers] to make them for everyone"); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 898–900 (Ariz. 2019) (Phoenix adopting similar interpretation of similar law).

Practically, this means Chris cannot legally offer to create photographs and blogs celebrating only opposite-sex weddings; he cannot adopt an editorial policy binding his company to create photographs and blogs only celebrating opposite-sex weddings; and he must offer and then create photographs and blogs celebrating same-sex weddings. Compl. ¶¶ 197– 203, 209. Doing otherwise would be to withhold, attempt to withhold, segregate, and adopt a pattern or practice of activities contrary to Virginia's law. This in turn strips Chris of his editorial discretion to control what content he offers and what content he creates and compels him to convey a message that violates his core convictions. That is compelled speech.

The Supreme Court already said so in *Hurley*. 515 U.S. at 572–73. There, an LGBT group tried to use a public accommodations law to gain access to a St. Patrick's Day parade. *Id.* at 561. But *Hurley* stopped this application because the parade was expressive. *Id*. at 578. So forcing the parade organizers to admit the LGBT group would alter the parade's content and infringe the organizers' right to speak the message they wanted. *Id.* at 572–73.

The same logic applies here. Virginia may not constitutionally use its public accommodations law to force Chris to offer or create photographs and blogs celebrating same-sex weddings or otherwise limit his editorial freedom to avoid conveying this message. Doing so would alter the content in Chris' photographs and blogs and burden his editorial freedom to convey his desired message. *See Tornillo*, 418 U.S. at 258 (requiring newspapers to publish op-eds affected "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper," which "constitute the exercise of editorial control and judgment").

Indeed, federal courts have repeatedly stopped anti-discrimination laws from burdening editorial freedom and compelling speech like this. *See, e.g.*, *TMG*, 936 F.3d at 752 (cannot force film studio to produce same-sex wedding films); *Claybrooks v. Am. Broad. Cos.*, Inc., 898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012) (cannot force television studio to cast certain actors); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) (cannot force internet company to publish search-engine material from protected group); *Melvin*, 2015 WL 251590, at *4 (cannot force newspapers to publish material from protected group). *Cf. McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 959–63 (9th Cir. 2010) (labor law cannot force newspaper to rehire employees seeking to influence editorial decisions); *Kania v. Fordham*, 702 F.2d 475, 478 n.5 (4th Cir. 1983) (stating University could not compel student newspaper "to provide

equal access to those disagreeing with its editorial positions" without violating freedom of the press); *B&N*, 448 P.3d at 898–900 (cannot force art studio to create invitations celebrating same-sex weddings). This Court should too.

To be sure, the laws in these cases like the law in *Hurley* did not "on its face, target speech"; its "focal point" was stopping "the act of discriminating." 515 U.S. at 572. But texts and purposes do not control. When "applied to expressive activity," the law still "require[d] speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own." *Id.* at 578. In other words, *Hurley* requires courts to look beyond a law's text or purpose to evaluate its effects *as-applied*. And that dooms the application of Virginia's law here. This law cannot compel Chris to photograph or blog or infringe on his editorial control over this speech.

What's more, Virginia cannot claim that Chris is merely a conduit for his client's speech. *See TMG*, 936 F.3d at 773–76 (Kelly, J., dissenting) (for this argument). Chris always retains editorial control over his art. Chris decides what content to capture, where to position himself, which photographs to discard, and the words and text to use in his blog post to tell a cohesive story about the intimacy of marriage. Compl. ¶¶ 77–79, 96–112; Decl. ¶ 79–84.

Like a commissioned biographer, Chris might tell stories about someone else to earn a living. But he is still the one telling the story. If Virginia could compel Chris to speak because he speaks about and receives payment from others, then officials could compel every paid writer, lawyer, publisher, painter, printer, graphic designer, advertising firm, newspaper, and internet company to speak any message. That is not the law. *Hurley*, 515 U.S. at 573, 575 (rejecting conduit argument because parade organizers "choose the content" of their speech and are "more than a passive receptacle" for someone else's message); *Tornillo*, 418 U.S. at 258 ("A

newspaper is more than a passive receptacle or conduit for news, comment, and advertising."); *TMG*, 936 F.3d at 753 (rejecting conduit argument for film studio); *B&N*, 448 P.3d at 911–12 (rejecting conduit argument for art studio); *see also Riley*, 487 U.S. at 794 n.8 (law could not compel professional fundraiser to speak on charity's behalf because fundraiser had "independent First Amendment interest in [its] speech").

### C.      The Accommodations Clause compels Chris to speak messages he objects to.

"Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

The same principle applies here. Chris believes that God created marriage to be between one man and one woman. Compl. ¶ 75. So Chris wants to create messages celebrating this view. *Id.* ¶ 77. When applied to Chris' photographs though, Virginia's law forces Chris to create and publish photographs celebrating same-sex weddings. This not only alters the formal content in these photographs; it reverses the message of these photographs—from celebrating opposite-sex marriage (Chris' photographs, left) to celebrating same-sex marriage (photographs by other Virginia photographers, right).







Similarly, Chris' photographs celebrate a union between one man and one woman and therefore convey a different message than those celebrating polygamous relationships.

 

The same is true for Chris' blogs. They too celebrate marriage between one man and one woman. *See* App. at 397 ("the beautiful couple, Chris and Yumi"), 383 ("differences are what make love between men and women so special"), 405 ("the lifelong commitment made between one man and one woman"). In contrast, photographers who celebrate same-sex weddings blog a different perspective. *See* Decl. ¶¶ 279 ("Julie and Kelly arrived to the venue together with their bridesmaids and bridesmen"), 285 ("Today I'm sharing some favorites from Drew and Mark's wedding from last October on Pride weekend in Atlanta."), 297 ("The love expressed in the eyes and on the faces of these two beautiful women this entire day was the biggest joy to document."), 303 ("This is real love, and it cannot be defined or limited by pointless demographics such as age, race or gender.").

The change in content and message is undeniable. After all, "[t]he First Amendment" protects both "those who oppose same-sex marriage" and "those who believe allowing same-sex marriage is proper or indeed essential." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015). Each side on this debate has a different message to say and different view to promote. Conflating the messages respects neither side.

That means compelling Chris to create photographs and blogs celebrating same-sex marriage is no small thing. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464. As both the Eighth Circuit and Arizona Supreme Court have held, forcing paid speakers to create speech celebrating same-sex weddings when they want to celebrate only opposite-sex weddings alters their message and compels their speech. *See TMG*, 936 F.3d at 753 (forcing filmmakers to create same-sex wedding films forced them to "convey the same 'positive' message in their videos about same-sex marriage as they do for opposite-sex marriage"); *B&N*, 448 P.3d at 909 (forcing art studio to write wedding invitations compelled speech because "writing the names of two men or two women … clearly does alter the overall expressive content of [studio's] wedding invitations"). And although "the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one." *Hurley*, 515 U.S. at 579.

Of course, this does not mean Chris objects to working with LGBT people or discriminates against anyone. Chris serves all people no matter their status. Indeed, Chris will gladly provide his adventure photography services to LGBT persons and provide his wedding services to LGBT persons seeking to promote opposite-sex marriages. Compl. ¶¶ 168–76. Chris simply cannot create speech celebrating same-sex marriages *for anyone*, whether they are gay,

straight, or anything else. For Chris, it's all about the content requested, not the client requesting. Just as atheist designers can decline to create websites promoting Christianity without discriminating against Christians, Chris can decline to create photographs and blogs promoting same-sex marriage without discriminating against anyone.

The Supreme Court drew the same message/status distinction in *Hurley*. There, it allowed parade organizers to decline an LGBT group's request to march because the organizers sought "to exclude a message it did not like from the communication it chose to make" and did not "exclude homosexuals as such" from the parade. 515 U.S. at 572, 574; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) (affirming same distinction in *Hurley*); *B&N*, 448 P.3d at 910 (declining to create same-sex wedding invitations "based on message, not status"); *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 258 (Utah 1994) (newspaper could decline religious advertisement because "it was the message itself that [the newspaper] rejected, not its proponents"). Chris has done nothing more here: serve people regardless of status and decline to speak certain messages. Chris deserves to exercise this editorial freedom just as other speakers exercise their editorial freedom on different subjects.

### D. Forcing Chris to speak creates a dangerous and limitless principle.

If Virginia can force Chris to celebrate messages about marriage he disagrees with, nothing stops Virginia from compelling other speech as well. In this sense, compelling Chris hurts speakers of all views and all beliefs.

For example, the same principles that protect Chris' freedom mean Virginia cannot force Muslim filmmakers to produce promotional films about synagogues because they do so about Mosques. Or force atheists to photograph Easter services and place those photographs in a church's out-reach emails because they do the same for secular groups. Or force LGBT-owned

printers to publish signs saying, "Join the Westboro Baptist Church" for that church just because they would publish signs saying, "Join the Unitarian Church" for that church. But if we stop protecting speaker autonomy, Virginia could compel a progressive bar association to publish advertisements promoting Israel in that association's magazine.[2] Or make "political belief" a protected class tomorrow and then force Democratic speech writers to write speeches supporting Republic politicians. *See TMG*, 936 F.3d at 756 (making this point).

Thankfully, Virginia lacks this power. In our pluralistic society, the First Amendment protects everyone's freedom of speech. No one should "be forced by the state … to renounce and forswear what they have come as a matter of deepest conviction to believe." *Greater Baltimore*, 879 F.3d at 113. That no one includes Chris too.

## II.    The law violates the First Amendment because it regulates Chris' speech based on content and viewpoint.

Laws may not "target speech based on its communicative content," unless they are narrowly tailored to serve a compelling government interest. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). *Reed* sets out a two-step inquiry. First, courts consider whether the law is facially content-based: does it facially "draw[] distinctions based on the message a speaker conveys." *Id*. at 163–64. Second, a facially content-neutral law may still regulate content as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* (cleaned up). *See also McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (law's application content-based "if it required enforcement authorities to examine the content of the message that is conveyed to

---

[2] Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for Discriminatory Rejection of Noncommercial Ad in Its Publication*, The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7.

determine whether a violation has occurred.") (cleaned-up). Virginia's law fails these requirements either facially, as-applied, or both.

> **A.      The Accommodation Clause compels speech based on content and viewpoint.**

As applied to Chris, the Accommodations Clause compels Chris to speak based on content and viewpoint in three ways.

First, the law compels Chris to celebrate same-sex weddings, which causes him to speak a message he would not otherwise convey and to change the content of his speech. *See supra*, § II.B; *Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."); *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) ("A regulation compelling speech is by its very nature content-based.").

Second, the law requires Chris to celebrate same-sex weddings because of his speech promoting opposite-sex weddings elsewhere. If Chris sticks to photographing landscapes and nature scenes, he is safe. Only if Chris creates photographs and blogs celebrating opposite-sex marriage must he create photographs and blogs promoting same-sex marriage. In this way, the content of Chris' prior speech triggers the Accommodation Clause's application. That makes the application content-based. *See Tornillo*, 418 U.S. at 256 (statute "exacts a penalty on the basis of the content" because it required newspapers to print editorial only if they printed editorial with particular content earlier); *PG&E*, 475 U.S. at 13–14 (law regulates based on content if it "condition[s] [access] on any particular expression" conveyed); *TMG*, 936 F.3d at 753 (law regulated based on content by treating filmmakers "choice to talk about one topic—opposite-sex marriages—as a trigger for compelling them to talk about a topic they would rather avoid—same-sex marriages").

Third, the law confers access based on speaker viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is … an egregious form of content discrimination."). If Chris speaks about same-sex marriage, the law does not require him to fulfill every request for his services, whether travel photography or anything else. But because Chris speaks about opposite-sex marriage, the law only requires him to create photographs and blogs for those seeking to celebrate same-sex engagements or weddings. That is a viewpoint-based access requirement. *See PG&E*, 475 U.S. at 13 (law discriminates based on viewpoint when it awards access "only to those who disagreed with the [speaker's] views"); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 654 (1994) (law in *PG&E* viewpoint-based because it "conferred benefits to speakers based on viewpoint, giving access only to a consumer group opposing the utility's practices").

> **B.     The Publication Clause restricts speech based on content and viewpoint.**

Besides compelling speech based on content and viewpoint, Virginia's law also restricts speech based on content and viewpoint—this time through its Publication Clause. In fact, the Publication Clause does this facially. The Clause makes it unlawful for public accommodations to "publish … any communication … to the effect that any … services of any such place shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation." Va. Code § 2.2-3904(B). Statements saying, "no photographs of animals" are allowed; those saying "no photographs of same-sex weddings" are forbidden. *See Campbell v. Robb*, 162 F. App'x 460, 468 (6th Cir. 2006) (ban on discriminatory advertisements in Fair Housing Act valid though "clearly a content-based speech regulation"). Whether the law restricts statements turns on what that statement declines. It all turns on content. Under the *Reed* test, that makes the

Publication Clause facially content-based and in turn makes the Clause's applications content-based too.

This reality also bears out when the Publication Clause is applied to Chris's desired speech. Chris wants to publish a statement on his website that declines to celebrate same-sex weddings. Compl. ¶ 228; Ex. 2. But the law forbids this statement solely because of its content: the particular services and views mentioned in Chris' statement—services celebrating marriage only between and man and a woman.

That makes the Publication Clause viewpoint-based too. The Clause allows Chris to post a statement on his website supporting marriage generally, supporting same-sex and opposite-sex marriage, or showing a willingness to create speech celebrating same-sex and opposite-sex marriages. But he cannot express views supporting only opposite-sex marriage or stating that he will only celebrate opposite-sex marriages. These restrictions favor particular views over others. That is viewpoint discrimination. *Rosenberger*, 515 U.S. at 829; *see Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996) (viewpoint discrimination for government to ban sign saying "gay marriage is a sin" but allowing sign advocating "person's right to choose whatever mate he or she wishes").

III.    **The law violates the First Amendment because it compels Chris to participate in and celebrate religious ceremonies he disagrees with.**

The First Amendment "guarantees at a minimum that a government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 577 (1992). This principle comes from both the Establishment and Free Exercise Clauses. *Id.* (grounding principle in former); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (forcing clergy to officiate wedding ceremonies violates latter).

Just as officials may not compel someone to attend or participate in chapel services, *Anderson v. Laird*, 466 F.2d 283, 284 (D.C. Cir. 1972) (per curiam), or in a "group exercise [that] signifie[s]" participation in prayer, *Lee*, 505 U.S. at 593–94, officials may not force someone to attend or participate in wedding ceremonies. Like many, Chris believes that weddings are religious ceremonies because they solemnize an institution (marriage) created by God. Compl. ¶ 162. Courts have recognized this unique quality of marriage and weddings. *See Obergefell*, 135 S. Ct. at 2594 (noting "the transcendent importance of marriage" that is "sacred" to many); *Turner v. Safley*, 482 U.S. 78, 96 (1987) ("[M]any religions recognize marriage as having spiritual significance ….").

But here, the Accommodations Clause requires Chris to treat same-sex weddings the same as opposite-sex weddings. *See supra*, § I.C (explaining Chris cannot treat requests to celebrate same-sex marriages differently than requests for opposite-sex marriages). This means Chris must not only attend same-sex wedding ceremonies to take pictures, sit in the audience, and listen to prayers, he must actively participate in these ceremonies by serving as a witness, greeting guests, bowing his head for prayers, congratulating and directing the couple for photographs, and standing in recognition of the marriage—things he always does for opposite-sex weddings. Compl. ¶¶ 113–21, Decl. ¶ 229–30.

But Chris cannot possibly do these things at same-sex wedding ceremonies without violating his belief that only marriage between a man and woman should be celebrated. *See Lee*, 505 U.S. at 593 ("[T]he act of standing or remaining silent was an expression of participation in the rabbi's prayer. That was the very point of the religious exercise."); *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 44–45 (1st Cir. 2016) (forcing police officer to listen and stand still "in close proximity" to group praying violated First Amendment); *Kaahumanu v. Hawaii*,

682 F.3d 789, 799 (9th Cir. 2012) ("The core of the message in a wedding is a celebration of

marriage and the uniting of two people in a committed long-term relationship."). So Virginia

cannot force Chris to participate in these events.

**IV.     The law violates the First Amendment because it restricts a hybrid of historically
protected rights.**

Laws that burden religious exercise in conjunction with other constitutional rights

violate a hybrid of rights and trigger strict scrutiny under the Free Exercise Clause. *See Emp't

Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990) (strict scrutiny for

"hybrid situation[s]" where free-exercise claim is linked with "other constitutional protections,

such as freedom of speech"). Although the Fourth Circuit has not decided whether to adopt the

hybrid-rights doctrine, at least one district court in this circuit has. *Hicks ex rel. Hicks v. Halifax

Cty. Bd. of Educ.*, 93 F. Supp. 2d 649, 663 (E.D.N.C. 1999) (strict scrutiny for hybrid free-

exercise and parental-right claims). Several other circuits agree and apply the doctrine when

there is a "colorable" claim that the government has violated a companion right. *See, e.g.*,

*Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 136 n.8 (5th Cir.

2009); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004) (hybrid-rights claim

is colorable when there is a "fair probability or likelihood, but not a certitude, of success on the

merits"); *see also TMG*, 936 F.3d at 759 (hybrid rights claim adequate where free-exercise

claim alleged in connection with communicative activity).

The Court should adopt this standard here. Indeed, compelling religious objectors to

speak is the paradigmatic hybrid-rights violation discussed in *Smith*. 494 U.S. at 881–82 (citing

historic examples of compelling religious objectors to speak messages they disagree with). And

Chris can show a colorable free speech claim since both the Eighth Circuit and Arizona

Supreme Court have found free speech violations in similar situations and no one seriously doubts that photographs and blogs deserve First Amendment protection. *See supra* §§ I.A–B.

This result fits the original understanding of the Free Exercise Clause as well. As even *Smith* acknowledges, courts have historically applied strict scrutiny to regulations compelling someone to speak religiously objectionable messages. This Court should follow this understanding here as well.[3]

## V.     The law fails strict scrutiny as applied to Chris' expression and participation.

Because Virginia's law compels Chris to speak, regulates his speech based on content and viewpoint, and compels him to participate in religious ceremonies, Virginia must prove that these applications are narrowly tailored to serve a compelling state interest. *Reed*, 576 U.S. at 163. Virginia cannot satisfy this difficult standard.

### A.     Virginia does not have a compelling interest to force Chris to celebrate same-sex weddings.

As for compelling interest, Virginia may try to invoke its need to stop discrimination to justify regulating Chris. But courts "look[] beyond broadly formulated interests" and consider "the asserted harm of granting specific exemptions to particular … claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). So Virginia cannot cite discrimination to justify regulating Chris. Chris does not discriminate. He merely declines to provide wedding services if doing so conveys a message he disagrees with. *See supra* § II.C (explaining message/status distinction).

---

[3] If this Court disagrees and applies the *Smith* standard—rational basis review for neutral and generally applicable laws burdening religion—then the *Smith* decision should be overturned. While this Court cannot do that, the Supreme Court recently granted certiorari in *Fulton v. City of Philadelphia,* 140 S. Ct. 1104 (Feb. 24, 2020) (no. 19-123) to consider doing so. So Chris wishes to preserve this issue for appeal. Chris has also alleged in the complaint that the law is not neural or generally applicable.

And courts have held that stopping discrimination does not justify compelling speech or forcing participation in wedding ceremonies. *Masterpiece*, 138 S. Ct. at 1727 (state could not force clergy to officiate wedding ceremonies); *Hurley*, 515 U.S. at 579 (using public accommodations law to compel speech was "fatal objective"); *TMG*, 936 F.3d at 755 ("regulating speech because it is discriminatory or offensive is not a compelling state interest"); *B&N*, 448 P.3d at 914–15 (same). Similarly, Virginia cannot commandeer Chris' photography or participation to "produce a society free of the corresponding biases." *Hurley*, 515 U.S. at 578.

Just as problematic, Virginia cannot identify an "actual problem" that justifies regulating Chris' photography and blogging. *Brown,* 564 U.S. at 799. Many photographers, bloggers, and other creatives in the wedding industry gladly provide services celebrating same-sex weddings. Compl. ¶¶ 286–88. Forcing Chris to do so despite so many alternatives makes little sense.

What's more, Virginia's law has numerous exceptions that undermine any basis for regulating Chris. *See Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

For one, Virginia allows public accommodations to discriminate against anyone "less than 18 years of age." Va. Code § 2.2-3904(D). Then for employers, Virginia allows businesses with fewer than fifteen employees to discriminate in some ways and businesses with fewer than five employees to discriminate against employees in any way. *Id.* at § 2.2-3905(A) (defining employer these ways). And for housing, Virginia allows discrimination based on how many properties someone owns and where the owner sleeps. *Id.* at § 36-96.2(A) (private sale exemption for single-family homeowner and owner-occupied rental exemption). But if Virginia allows rank status discrimination in these situations, Virginia cannot justify compelling Chris to

convey messages or participate in ceremonies he disagrees with, especially since he does not discriminate against anyone. *Brown*, 564 U.S. at 802 (law restricting sale of violent video games to minors undermined because state failed to regulate violence in books, cartoons, and movies).

### B.    The law lacks narrow tailoring.

For narrow tailoring, Virginia must prove that regulating Chris is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). But Virginia has many better options.

First, Virginia could apply its law to regulate actual status discrimination, not message-based objections when speaking. *Supra* § II.C. Courts around the country already do this without problem. *See supra* §§ I.B–C (citing cases in Arizona, Utah, Eighth Circuit, and elsewhere). In other words, Virginia can stop status discrimination and still respect the First Amendment. Under Chris' proposal, Virginia can achieve all its (legitimate) interests.

Second, Virginia could create a "bona fide relationship" exception when classifications are integral to expressive services. Colo. Rev. Stat. § 24-34-601(3). Title VII already did this when it created a bona fide occupational qualification exception for employment classifications necessary for decisions affecting expression. 42 U.S.C. § 2000e–2(e)(1); 29 C.F.R. § 1604.2 (interpreting Title VII to allow production studios to make classifications for BFOQs when "necessary for the purpose of authenticity or genuineness … e.g., [selecting] an actor or actress"). In fact, Virginia already allows several BFOQ exceptions for preferences in advertising and hiring for employment positions where "religion, sex, age, or national origin is a [BFOQ] for employment." Va. Code. §§ 2-2.3905(B), (C).

Third, Virginia could exempt individuals and small businesses that celebrate weddings. Mississippi has already done this without problems. Miss. Code § 11-62-5(5)(a) (exempting

photographers and other businesses that decline to provide wedding services based on sincere belief in marriage between a man and a woman). And the federal government has interpreted the First Amendment to *require* this freedom for those wanting to speak only in support of marriage between a man and a woman. Br. for the United States as Amicus Curiae Supporting Pet'rs at 22, *Masterpiece*, 138 S. Ct. 1719 (2018) (No. 16-111) (public accommodation law could not force speakers to celebrate same-sex weddings).

Fourth, Virginia could interpret its law to not apply to highly selective entities. Courts have recognized such distinctions for selective university programs, *Vejo v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1168 (D. Or. 2016), *rev'd and remanded on other grounds*, 737 F. App'x 309 (9th Cir. 2018), and selective insurance companies, *Cut 'N Dried Salon v. Dep't of Human Rights*, 713 N.E.2d 592, 595–96 (Ill. App. Ct. 1999). The same logic applies to businesses when they create expression and exercise selectivity to convey the message they want.

Fifth, Virginia could define public accommodations narrowly to apply only to essential or non-expressive or non-internet businesses like restaurants, hotels, and stadiums. The federal government and several other states already do this. *See* 42 U.S.C. § 2000a(b) (defining public accommodations as hotels, restaurants, entertainment venues, and gas stations); Fla. Stat. § 760.02(11) (same); S.C. Code. Ann. § 45-9-10(B) (same); *Freedom Watch v. Google*, No. 19-7030, 2020 WL 3096365, at *2 (D.C. Cir. May 27, 2020) (interpreting DC public accommodation law only to apply to physical places, not online businesses).

## VI.  The remaining preliminary injunction factors favor granting an injunction.

When a plaintiff alleges a First Amendment violation, the remaining preliminary injunction factors fall into place. The loss of First Amendment freedoms always constitutes an irreparable injury. *WV Ass'n of Club Owners*, 553 F.3d at 298 ("[I]n the context of an alleged

violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim."); *Newsom*, 354 F.3d at 261 ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Nor is Virginia harmed by a preliminary injunction that prevents it from enforcing a statute that is likely unconstitutional as applied to Chris. *Legend Night Club v. Miller*, 637 F.3d 291, 303–04 (4th Cir. 2011); *Newsom*, 354 F.3d at 261. Finally, "upholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 303; *Newsom*, 354 F.3d at 261. All these standard principles apply here too and justify Chris' requested injunction.

## Conclusion

Forcing Chris to celebrate weddings he disagrees with violates the First Amendment and ultimately threatens everyone's free speech and religious liberty. To stop this violation, Chris asks this Court to grant his preliminary injunction motion.

Respectfully submitted this 30th day of June, 2020.

By:  *s/ Steve Taylor*

<div style="display:flex">

Jonathan A. Scruggs
Arizona Bar No. 030505*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

Steve C. Taylor
Virginia Bar No. 31174
**The Alliance Legal Group P.L.L.C.**
133 Mount Pleasant Road
Chesapeake VA 23322
(757) 482-5705
(757) 546-9535 (facsimile)
stevetaylor@call54legal.co

</div>

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 258
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

<div align="center">

ATTORNEYS FOR PLAINTIFFS

</div>

*Motions for *Pro Hac Vice* admission filed concurrently

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of June, 2020, I electronically filed the foregoing paper

with the Clerk of Court using the ECF system, and I hereby certify that the foregoing paper will

be served via private process server with the Summons and Complaint to the participants:

Mark R. Herring, Attorney General
Commonwealth of Virginia
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

R. Thomas Payne, II, Director
Civil Rights Unit/SAAG Fair Housing
Division of Human Rights and Fair Housing
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

*s/ Steve C. Taylor*
Steve C. Taylor
*Attorney for Plaintiffs*